ESTATE OF LOUIS YAEGER, DECEASED, JUDITH WINTERS, RAPHAEL MEISELS, ABRAHAM K. WEBER, AND THE BANK OF NEW YORK, EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Yaeger v. Commissioner
Docket No. 20514-83
United States Tax Court
T.C. Memo 1988-264; 1988 Tax Ct. Memo LEXIS 292; 55 T.C.M. (CCH) 1101; T.C.M. (RIA) 88264; June 21, 1988
Richard A. Levine, Sidney I. Roberts and John M. Graham, for the petitioners. Jack H. Klinghoffer and Sandy E. Freund, for the respondent. *293 WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By a notice of deficiency dated April 15, 1983, respondent determined deficiencies in Louis and Betty Yaeger's Federal income tax for the taxable years 1979 and 1980 in the amounts of $ 936,755 and $ 611,796, respectively. [1]
After concessions, [2] the sole issue for our consideration is whether Yaeger was engaged in a trade or business with respect to his stock market *294 trading activity and, if so, whether he is entitled to deduct interest paid with respect to the stock market trading activity, regardless of the limitation on the deductibility of investment interest in section 163(d). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Louis Yaeger, the decedent (Yaeger or the decedent), and Betty Yaeger, his wife, resided in New York, New York. The Yaegers filed joint returns for taxable years 1979 and 1980 with the Internal Revenue Service Center in Holtsville, New York. Yaeger died on May 11, 1981. On April 19, 1982, Judith Winters, Raphael Meisels (Meisels), Abraham K. Weber (Weber) and the Bank of New York were duly appointed executors (hereinafter collectively referred *295 to as petitioners or as the executors) of Yaeger's will by the Surrogate's Court of the State of New York in the County of New York. The executors, representing the estate of the decedent, filed a petition in this Court on July 15, 1983. At the time of filing all of the executors resided in New York, New York. Betty Yaeger filed a separate petition on July 18, 1983. On November 20, 1985, Betty Yaeger agreed to be bound by the outcome of the case brought by the executors of her husband's estate and is not a party in the instant proceeding. Yaeger's life story unfolded through the testimony of his lifelong friend, Meisels [4] and by Yaeger's daughter and son-in-law, Judith [5] and Harold Winters. All three were knowledgeable and experienced with respect to stock market trading activities. *296 Yaeger graduated Phi Beta Kappa from Columbia University in 1921 having studied business and finance. Upon graduation he went to work as an accountant and subsequently became employed as an auditing agent for the Internal Revenue Service (the Service). He left the Service's employ in 1923 and went to work as a bond salesman in New York City, eventually becoming an investment counselor. As an investment counselor, Yaeger often solicited new customers by giving free advice until they developed confidence in his abilities. Commencing in the mid-1920's, Yaeger began actively trading [6] stocks and bonds on the stock market on his own account in addition to conducting his investment consulting business. In the 1940's Yaeger gave up his investment consulting business because the management of his own account had grown so demanding. Thereafter, he devoted himself exclusively to trading on his own account, which was his sole occupation until the day he died. *297 Prior to 1979, Yaeger maintained accounts with several brokerage firms in New York, including H. Hentz & Co., Pennington Colket & Co., F. T. Keech & Co., E. F. Hutton and Sterling Grace. His account at H. Hentz & Co. was the largest account that firm had maintained for an individual United States citizen. During the period between 1979 and his death, Yaeger maintained accounts with Balfour Securities, Inc., [7] Coleman & Co., [8] and Laidlaw Adams & Peck, Inc. On occasion Yaeger also dealt with Cohn, Delaire & Kaufman, Inc. [9] and Mabon, Nugent & Co.
Trading activity in Yaeger's various accounts throughout the years in issue, is described in the following chart: Purchase
Sales
Number Shares
Number Shares
Year
Transactions
Transactions
Bought
Sold
1979
1,176
86
1,453,555
822,955
1980
1,088
39
1,658,841
173,165
*298 Yaeger maintained an office at H. Hentz & Co. (Hentz) from which he conducted most of his trading activity, although for a period of time he also maintained an office at Pennington, Colket & Co. After his retirement, Meisels joined Hentz as a partner and had an office near Yaeger's office. Hentz provided Yaeger with an assistant, a telephone, use of the secretarial pool, and access to the research staff and facilities. The assistant answered the phone, placed orders and assisted Yaeger's research efforts. Yaeger spent a full day at his office, researching investment opportunities and placing orders, and then returned home to read more financial reports late into the night. He worked every day of the week. When he was out of town he maintained telephone contact with the brokers who handled his accounts. Yaeger was trading on the stock market the day before he died. Judith Winters indicated that her father's tremendous industry stemmed from his profound enjoyment of the subject matter he studied. In his stock market activities, Yaeger subscribed to a distinct investment strategy. Yaeger's trading strategy was to buy the stock of companies in which the stock prices were extremely *299 undervalued and hold the stock until the price returned to a level which reflected the underlying value of the company. He rarely purchased "blue chip" stocks and many of the stocks he held did not pay dividends. Instead, Yaeger constantly looked for companies which were experiencing financial distress but whose underlying value was not widely recognized. This strategy required extensive and thorough research. Because he was only interested in companies whose fortunes were temporarily unfavorable, his research extended beyond the study of mainstream publications. Yaeger read several journals and newspapers every day, including The Wall Street Journal, Forbes, Fortune, Financier and Barron's. He also pored over annual reports published by the companies whose stock he was considering purchasing. He studied reports from brokerage houses, Standard & Poors and Moody's. Yaeger searched the listing of stocks whose prices had recently hit new low levels. He also searched for companies which had recently failed to pay dividends. He looked for companies which had lately filed bankruptcy, particularly companies which held valuable but underutilized assets. For his research purposes, *300 Yaeger required highly detailed information. Before purchasing stock he often wanted to know who had owned the stock he was interested in. If he needed particular information he occasionally telephoned the officers and managers of the company about which he was curious. Once Yaeger determined that the targeted company was experiencing temporary difficulties, he began to accumulate the stock. Yaeger would buy stock as it became available, although some of the companies in which he was trying to invest were not frequently or actively traded and the stock was difficult to acquire. In the initial stages of his acquisition, he bought stock in small quantities to avoid attracting the attention of other investors. When he attained a sizable amount of stock he would let his position become known. [10]
Yaeger took whatever steps he thought necessary to improve the position of the *301 companies in which he was invested, often supplying unsolicited business advice to the managers. Sometimes that advice was well received and the companies followed it. Occasionally, in order to strengthen the companies in which he held stock, Yaeger attempted to arrange mergers or acquisitions. [11] If management was intractable and Yaeger believed that their policies would inhibit the company's growth, he would sell his stock in the company. Yaeger's investment strategy produced some startling successes. [12] For example, in 1980 Yaeger investigated a company called Seton Co., which was suffering considerable financial hardship. Seton Co. manufactured a material for covering automobile seats and sales had declined due to a slump in the automobile industry. Through reading a footnote in the annual report, Yaeger discovered that a division of Seton Company had discovered and manufactured a material which could be used as artificial *302 skin. On the basis of the prospects for that division alone, Yaeger invested in Seton Co. Years later, the value of stock in Seton Co. rose dramatically as the company shifted to manufacturing artificial skin. Similarly, Yaeger purchased bonds issued by the New York, New Haven and Hartford Railroad between 1970 and 1979 while the company was in bankruptcy. Yaeger purchased some of the bonds for as little as $ 8 per $ 100 of face value. In 1979, after the company had been reorganized as Penn Central Corporation, Yaeger sold the bonds for about $ 80 apiece. In addition to selecting financially troubled companies *303 in which to invest, Yaeger increased his gain on his investments by using margin debt. Yaeger financed his purchases by borrowing to the maximum extent allowable under law and the custom of the brokerage houses, which was generally 50 percent. If the value of his stock rose he would use that increased value as equity to support more debt. From time to time Yaeger shifted accounts from one brokerage house to another in order to maximize the volume of margin debt he could carry. During the years 1979 and 1980, the ratio of Yaeger's margin debt to portfolio value was 47 percent and 42 percent, respectively. Yaeger's total stock market related debt equalled $ 42,154,048 in 1979 and $ 54,968,371 in 1980. When he died, his portfolio was subject to debt in the amount of $ 70,490,018. Yaeger's maximum use of margin debt occasionally created problems for him, because if the value of his holdings in a particular account fell below the amount which the brokerage firm required to support the debt that the account was carrying, he was forced to sell enough stock to cover the debt even if it resulted in a loss. Once or twice during the course of his investment career Yaeger was almost *304 "wiped out." [13]
Yaeger dedicated as much thought and careful planning to the decision of when to sell stock as he did to the decision of what stock to buy. He tried to hold stocks until they had increased in price to a level which he determined accurately reflected the company's true worth. Because he waited until there was a high enough price and corresponding demand, he was usually able to sell his entire block of stock quickly. In 1979 and 1980 Yaeger reported income in the following amounts on his Federal income tax return: 1979
Character of Income
Amount
Long-Term Capital Gain
$ 13,839,658
Short-Term Capital Gain
184,354
[14] Dividends 2,339,080
Interest
57,958
TOTAL   $ 16,421,050
1980
Character of Income
Amount
Long-Term Capital Gain
$ 1,099,921
Short-Term Capital Gain
728,404
[14] Dividends 3,648,441
Interest
91,717
Director's Fees
10,600
TOTAL   $ 5,579,083
*305 Of the stock which Yaeger sold in taxable years 1979 and 1980, the percentage of total sales of securities which he had held for 12 months or more was 88 percent and 91 percent, respectively. The purchase dates of the securities sold in 1980 ranged from March 1970 to December 1979. In 1979 Yaeger did not sell any security which had been held for less than three months and in 1980, each security sold had been held for at least six months. On Schedule C of the joint returns, Yaeger deducted interest expense in 1979 and 1980 in the amounts of $ 5,865,833 and $ 7,995,101, respectively. OPINION The sole issue for our consideration is whether Yaeger was subject to the limitation on investment interest imposed by section 163(d). Section 163(d) restricts the amount of the deduction which can be claimed for interest which is *306 paid or accrued with respect to investment property. [15] On the other hand, interest paid or accrued on indebtedness which is incurred to acquire or carry property for the taxpayer's trade or business is fully deductible. Sec. 163(a). The House Report pertaining to section 163(d) explains that the primary concern underlying the section was the possibility *307 that a deduction for investment interest could offset other unrelated income. Furthermore, the report continued: Where the taxpayer's investment * * * produces little current income, the effect of allowing a current deduction for the interest is to produce a mismatching of the investment income and related expenses of earning that income. In addition, the excess interest, in effect, is used by the taxpayer to offset other income, such as his salary, from taxation.
H. Rept. 91-413 (Part I) (1969), 1969-3 C. B. 200, 245. Historically, we have recognized three distinct categories of securities ownership, the most clear cut of which is the securities dealer. Dealers regularly buy and sell to customers and provide such other services as required to manage the securities holdings of their clients. Dealers fall clearly into the category of persons who are in the trade or business of buying, owning and selling securities. Kemon v. Commissioner,16 T.C. 1026, 1032-1033 (1951). On the other end of the spectrum, a passive investor who holds stock for its dividend yield and for the ultimate profit from resale is not considered to be engaged in a trade *308 or business with respect to his stock ownership activities. Higgins v. Commissioner,312 U.S. 212 (1941); City Bank Farmers Trust Co. v. Helvering,313 U.S. 121 (1941); United States v. Pyne,313 U.S. 127 (1941); Gajewski v. Commissioner,723 F.2d 1062 (2d Cir. 1983), cert. denied 469 U.S. 818 (1984); Moller v. United States,721 F.2d 810 (Fed. Cir. 1983). Between the securities dealers and the passive investors lies the securities trader. Unlike a securities dealer, a trader has no customers and trades only on his own account. However, the trading activity in which traders engage resembles the activity of a dealer in every other respect. Kemon v. Commissioner, supra.
Respondent initially contends that the section 163(d) limitation on the deduction for investment interest applies to all interest paid or accrued with respect to any investment in securities. With an exception for securities dealers who sell to customers, respondent maintains that there can be no distinction between trading securities as an investment and trading securities as a trade or business.[16] *309 However, respondent's position is one which we and other courts have consistently declined to adopt. Snyder v. Commissioner,295 U.S. 134 (1935); Levin v. United States,597 F.2d 760 (Ct. Cl. 1979). As we recently held in King v. Commissioner,89 T.C. 445 (1987), the debt which a trader incurs in order to carry on the trade or business of trading is not subject to section 163(d).[17]
Whether a taxpayer's trading activities rise to a level which *310 constitutes a trade or business is a question of fact and circumstances. Higgins v. Commissioner, supra;Liang v. Commissioner,23 T.C. 1040, 1045 (1955). In Commissioner v. Groetzinger, 480 U.S.     (1987), the Supreme Court reviewed the definition of the phrase "trade or business" as it evolved through decades of case law. [18] In determining that the taxpayer's gambling activities constituted a trade or business, the Court abandoned the historical requirement that a person in a trade or business must provide goods and services to the public. Rather, the Court decided that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." 107 S.Ct. at 987. The question of when the trading activity of a taxpayer passes over the line between investment activity and trade or business activity has been frequently litigated. From the many cases, various factors have developed for purposes *311 of distinguishing the different types and degrees of activities. In order to be engaged in the trade or business of trading securities, the taxpayer must be actively involved in the trading activities. Liang v. Commissioner, supra at 1045. The activity must absorb a major portion of the taxpayer's time and efforts and be conducted for the purpose of making a livelihood. Snyder v. Commissioner, supra at 139. A trade or business requires more than keeping records, collecting income from interest and dividends, and exercising managerial supervision over the securities accounts. Higgins v. Commissioner, supra at 218. Ordinarily, neither a trust nor an estate can be a trade or business. City Bank Farmers Trust Co. v. Helvering, supra;United States v. Pyne, supra.
A trader derives his profit primarily from frequent exchanges which take advantage of short-term swings in the market rather than from interest, dividends and long-term appreciation. King v. Commissioner, supra at 458; Liang v. Commissioner, supra at 1043; Moller v. United States, supra at 815. *312 Thus, an emphasis on capital growth and an expectation of profit from resale alone, coupled with dim prospects for current net income, indicate at investment motivated activity rather than a trade or business. Miller v. Commissioner,70 T.C. 448, 457 (1978). Petitioners maintain that Yaeger's stock market activities constituted a trade or business and, therefore, that the interest accrued with respect to those activities cannot be subject to the limitations imposed by section 163(d). Petitioners bear the burden of proving that Yaeger's stock market activities were a trade or business. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Petitioners urge us to conclude that Yaeger was a trader on the grounds of his active involvement with the management of his stock and bond holdings. They point to the dedication and zeal with which he studied the market, the extensive research he conducted, the strategic buying and selling of stock, and the generally professional attitude he displayed toward his stock market activities. Petitioners argue that because the highly leveraged positions Yaeger took would be too speculative for the average *313 investor, we are constrained to conclude that he was a trader. Petitioners rely heavily on Levin v. United States, supra, in which the United States Court of Claims decided, among other issues, that the taxpayer's stock market activities were a trade or business. Like Yaeger, Levin devoted all his time and attention to the buying and selling of stocks for his own account although Yaeger's stock market trading equalled or exceeded Levin's in quantity. Levin frequently visited the companies in which he held stock to give suggestions and advice to management just as Yaeger did. Levin also actively studied the market and associated with other investors although Yaeger's research was more extensive and the positions he eventually held were more risky. Levin, like Yaeger, purchased to the maximum extent of available margin debt. Petitioners therefore urge us to find that Yaeger was a trader because he conducted his stock market activities with even greater zeal and thoroughness than Levin did. Levin's extensive personal involvement with his stock market trading, coupled with the volume of transactions which transpired, led the Court of Claims to determine that *314 he was in the trade or business of trading on the stock market. Levin v. United States, supra at 765. In reaching this conclusion the court wrote "a 'trader' is an active investor in that he does not passively accumulate earnings, nor merely oversee his accounts, but manipulates his holdings in an attempt to produce the best possible yield." Levin v. United States, supra at 765. Respondent counters that Yaeger was never more than an investor with respect to his stock market activities. Citing to Moller v. United States, supra at 814, respondent maintains that the considerable time and energy Yaeger spent managing his investments is not in itself sufficient to bring his trading activities to the level of trade or business. Respondent further asserts that the two fundamental criteria for distinguishing between traders and investors established in Liang v. Commissioner, supra, control the result here. In Liang, we found that the length of the holding period is a determining factor, while the second factor is whether the activity produces current income from dividends and interest. 23 T.C. at 1045. *315 Respondent argues that because Yaeger's stock was held with an eye toward long-term appreciation in value, and because Yaeger had received dividends and interest in taxable years 1979 and 1980 in the amounts of $ 2,397,038 and $ 3,740,158, respectively, Yaeger's activity satisfied both parts of the test put forward in Liang v. Commissioner, supra.
After carefully reviewing all the facts and circumstances as established by the testimony and exhibits, we conclude that Yaeger was not a securities trader within the meaning of section 163(d), because he held his stocks and bonds for lengthy periods of time anticipating that they would appreciate in value. There is no doubt that Yaeger devoted greater time, energy, enthusiasm and dedication to his stock market activities than many people devote to their full time employment. His investment strategy was unique and he maintained a margin of debt which would have caused a more faint-hearted investor to quail. His activity with respect to the management of his holdings was continuous, regular and conducted for profit. Despite the impressive nature and extent of Yaeger's stock market trading activities, however, this *316 is not the sole determination of the issue. The pivotal inquiry is whether Yaeger was interested in deriving income from capital appreciation or from short-term trading. In resolving this issue we cannot summarily dismiss those cases which indicate that the length of the holding period is a crucial factor in determining whether a taxpayer's trading activities rise to the level of a trade or business. See, e.g., Miller v. Commissioner, supra; Moller v. Commissioner, supra.As we recently noted in King v. Commissioner, supra at 461, "the primary characteristic which differentiates the activities of a trader from those of an investor is that a trader seeks short-swing gains while an investor seeks long-term appreciation." While we have never articulated the specific duration of holding period which divides short-swing gain from long-term appreciation, clearly Yaeger's holding periods of several years were not short-swing. Yaeger's purchases often preceded his sales by months, if not years. For example, he spent nine years accumulating the stock he held in the New York, New Haven and Hartford Railroad. The Cuban bonds had not been sold by the *317 time he died. There is no evidence which would suggest that Yaeger intended to derive profit from relatively short-term turnovers. Rather, the bulk of Yaeger's investments were oriented toward long-term appreciation due, in large part, because they had so little value when he bought them. Accordingly, we are unable to find any distinguishable difference between the lengthy periods for which Yaeger held his securities and the holding periods which create investor status for purposes of section 163(d). Yaeger's stock market activities were fundamentally the same as the activity of other investors. He targeted a stock which was, for some reason, selling at a price below what it was worth. He bought the stock at this low price and waited for the fortunes of the company to improve, finally selling the stock for a profit. This activity is defined as investment. The distinguishing characteristic with respect to Yaeger's activity is that he took unusually risky positions, based on his extensive research, and that he produced some startling successes. This, however, only makes him a very good investor, rather than a trader. Although Levin v. United States, supra, *318 is factually similar in many respects, the opinion did not discuss the frequency of the taxpayer's trades or whether they were short-term transactions or investments held for capital appreciation. However, the record shows that Yaeger held his stocks and bonds a lengthy period hoping for capital appreciation and in consideration of the length of holding period criterion which we have historically employed to assist us in determining whether a taxpayer who manages his own investments is an investor or a trader, we have concluded that Yaeger was an investor. [19]
*319 In light of the reasons put forward above, we hold that Yaeger was not a trader but rather was an investor within the meaning of section 163(d). Therefore, the deductions for interest which Yaeger claimed for taxable years 1979 and 1980 are subject to the limitation on investment interest of section 163(d). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. In a notice of deficiency dated April 15, 1983, respondent also determined a deficiency in petitioners' 1981 Federal income tax in the amount of $ 451,669.25. With respect to taxable year 1981 only, respondent determined an addition to tax under section 6651(a) in the amount of $ 67,749. On November 12, 1985, petitioners moved to dismiss for lack of jurisdiction with respect to taxable year 1981 on the ground that respondent had failed to issue a notice of deficiency with respect to the proper taxable year. We granted this motion and respondent appealed our decision to the United States Court of Appeals for the Second Circuit. (Appeal from our order was dismissed by the court of appeals. 801 F.2d 96↩ (2d Cir. 1986)). 2. Respondent conceded that petitioners were entitled to a net operating loss carry forward to taxable year 1979 only. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Meisels had known Yaeger since they began working together for the Internal Revenue Service in the 1920s. Meisels continued working as an agent for approximately forty years all the while amassing considerable wealth through stock market trading on his own account. He is currently honorary chairman Emeritus of Shearson Lehman Bros., Inc.↩
5. Judith Winters is a financial analyst in her own right having studied finance and business at her father's urging. She described her own investment strategy as more passive and less bold than her father's. ↩
6. In describing Yaeger's activities with respect to his securities holdings, we use such words as "speculate," "trade," "invest" and similar terms purely for convenience and without intending any inference as to the tax characterization or consequences of any aspect of the transaction. ↩
7. Transactions handled for Yaeger's account by Balfour Securities Corp. were cleared through A. G. Becker, Inc. and Merrill Lynch Pierce Fenner & Smith. ↩
8. Transactions which were handled for Yaeger's account by Coleman & Co. were cleared through L. F. Rothschild, Unterberg, Towbin. ↩
9. Transactions handled for Yaeger's account by Cohn, Delaire & Kaufman, Inc. were cleared through Lehman Bros. ↩
10. Once his position had been established Yaeger would encourage other investors to join him in buying stock but frequently he failed to attract much of a following. His investments were considered by many to be too speculative. His investments rarely coincided with conventional Wall Street wisdom. ↩
11. Judith Winters noted that this type of advice was usually disregarded because it might require that current management relinquish control of the company. Protecting the feelings of the current management was not one of Yaeger's priorities. ↩
12. One of Yaeger's investments was so speculative that he died without finding out if his prediction had been correct. For some time prior to his death Yaeger had been buying Cuban bonds which were issued by the Cuban government before the revolution which brought Castro to power. Yaeger decided that Castro would eventually be unseated and that the subsequent government might honor the debt of the pre-Castro regime. Yaeger was able to purchase the bonds at an extremely low price relative to the face value but died before learning if he would recoup his investment. ↩
13. The testimony was unclear on the details of Yaeger's periods of financial distress but Leo Boruchoff, Yaeger's broker at Coleman & Co., indicated that there had been a forced sale of Yaeger's stock in order to pay margin debt in both 1965 and 1974. He surmised that this situation probably occurred at other times as well. ↩
14. These figures were taken from Yaeger's income tax returns for the years 1979 and 1980. In exhibits and briefs the parties used the figures $ 2,281,122 and $ 3,556,724 for dividend income in 1979 and 1980, respectively. Since there was no explanation provided for the discrepancy, we have chosen to rely on the figures put forth in the tax returns. ↩
15. Section 163(d) provided in pertinent part: (1) In General. -- In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in section (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to -- (A) $ 10,000 * * *, plus (B) the amount of the net investment income * * *, plus the amount (if any) by which the deductions allowable under this section * * * and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year. * * * (D) Investment Interest. -- (i) In General. -- The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. ↩
16. Respondent's concern, quite understandably, is that the dealer is entitled to all the tax advantages reserved for businesses and yet reports his gain and losses from his business as capital gain or loss. As we discussed in King v. Commissioner,89 T.C. 445, 457-458 (1987), citing to Wood v. Commissioner,16 T.C. 213↩ (1951), this arrangement was intended by Congress. 17. This conclusion was supported by the legislative history for section 163(d) which provided that "interest on funds borrowed in connection with a trade or business would not be affected by the limitation." H. Rept. 91-413 (Part I) (1969), 1969-3 C.B. 200↩, 246. 18. See generally: Boyle, "What is a Trade or Business?," 39 Tax Lawyer 737↩ (Summer 1986). 19. On April 27, 1987, respondent made a motion to strike certain appendices which had been attached to petitioner's reply brief. These appendices were documents which had been submitted into evidence and included into the record of the Court of Claims case. Levin v. United States,597 F.2d 760 (Ct.Cl. 1979). Because these documents were not properly introduced into the record in the case before us we can only consider them as evidence if we take judicial notice of them. Rule 143(b). However, rule 201(b), Fed. R. Evid., limits the material over which we may take judicial notice to that which is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Although we generally take judicial notice of the existence of opinions from other courts we rarely include judicial notice of the findings of fact set forth in those opinions. Estate of Reis v. Commissioner,87 T.C. 1016, 1028↩ (1986). Therefore we decline to consider the appendices in question as evidence before us.