889 F.2d 29
 64 A.F.T.R.2d 89-5801, 89-2 USTC P 9633
 ESTATE OF Louis YAEGER, Deceased, Judith Winters, Ralph
Meisels, Abraham K. Weber, and The Bank of New
York, Executors, Petitioners-Appellants,
Cross-Appellees,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee,
Cross-Appellant.
 Nos. 60, 180, Dockets 89-4045, 89-4059.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 28, 1989.
Decided Nov. 7, 1989.
 
 1
 Roberts & Holland, New York City (Richard A. Levine, of counsel), for petitioners-appellants, cross-appellees.
 
 
 2
 Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Richard Farber, Mary Frances Clark, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee, cross-appellant.
 
 
 3
 Before FEINBERG and NEWMAN, Circuit Judges, and MISHLER, Senior District Judge.*
 
 MISHLER, Senior District Judge:
 
 4
 Petitioner appeals from a decision and order of the tax court, unofficially reported at 55 T.C.M. (CCH) 1101 (1988) (Wright, J.), that found that Louis Yaeger, deceased, was not in the trade or business of trading in securities and, therefore, that the interest he incurred in buying securities on margin was "investment interest" within the meaning of 26 U.S.C. section 163(d) and ordered that there is a deficiency due from the taxpayer for taxable years 1979 and 1980.[1] Respondent cross-appeals an unreported order of the tax court that granted the estate's motion to dismiss its petition for lack of jurisdiction as to the 1981 taxable year because the notice of deficiency set forth an incorrect taxable year.[2]
 
 
 5
 We affirm the tax court's order that there is a deficiency due from the taxpayer for taxable years 1979 and 1980. We reverse the order that dismissed so much of the petition that referred to tax year ending December 31, 1981 for lack of jurisdiction and remand for a trial on the issue of Yaeger's tax liability for the portion of the 1981 tax year ending May 11, 1981.
 
 
 6
 I. TRADE OR BUSINESS OF TRADING IN SECURITIES
 
 A. Background
 
 7
 The facts as stipulated and found by the tax court are not in dispute.[3] Yaeger graduated Phi Beta Kappa from Columbia University in 1921 having studied business and finance. Upon graduation he went to work as an accountant and subsequently became employed as an auditing agent for the Internal Revenue Service. He left this employ in 1923 and went to work as a bond salesman in New York City, eventually becoming an investment counselor.
 
 
 8
 Commencing in the mid-1920s, Yaeger began actively trading stocks and bonds on the stock market on his own account in addition to conducting his investment consulting business. In the 1940s, Yaeger gave up his investment consulting business because the management of his own account had grown so demanding. Thereafter, he devoted himself exclusively to trading on his own account, which was his sole occupation until the day he died.
 
 
 9
 Prior to 1979, Yaeger maintained accounts with several brokerage firms in New York, including H. Hentz & Co. His account at H. Hentz & Co. was the largest account that firm had maintained for a United States citizen. During the period between 1979 and his death, Yaeger maintained accounts with three brokerage firms and occasionally dealt with two others.
 
 
 10
 The following chart describes the trading activity in Yaeger's various accounts throughout the years in issue:
 
 
 11
 Year Purchase Sales Number Shares Bought Number Shares
 Transactions Transactions Sold
1979 1,176 86 1,453,555 822,955
1980 1,088 39 1,658,841 173,165
 
 
 12
 Yaeger maintained an office at H. Hentz & Co. from which he conducted most of his trading activity. For a brief period of time he also conducted his activity from another brokerage firm. H. Hentz & Co. provided Yaeger with an assistant, a telephone, use of the secretarial pool, and access to the research staff and facilities. Yaeger spent a full day at his office, researching investment opportunities and placing orders, and then returned home to read more financial reports late into the night. He worked every day of the week. When he was out of town, he maintained telephone contact with the brokers who handled his accounts. Yaeger was trading on the stock market the day before he died.
 
 
 13
 Yaeger subscribed to a distinct investment strategy. His trading strategy was to buy the stock of companies in which the stock prices were extremely undervalued and hold the stock until it reached a price that reflected the underlying value of the company. He rarely purchased "blue chip" stocks and many of the stocks he held did not pay dividends. Instead, Yaeger constantly looked for companies that were experiencing financial distress but whose underlying value was not recognized.
 
 
 14
 This strategy required thorough research that extended beyond the study of mainstream publications. He also poured over annual reports and brokerage house reports. Once Yaeger determined that the targeted company was experiencing temporary difficulties, he began to accumulate the stock. He would buy stock as it became available, although some of the stock was not frequently or actively traded and was difficult to acquire. He would initially buy small quantities of stock to avoid attracting attention from other investors. Once he obtained a sizeable amount of stock he would let his position be known. Yaeger took whatever steps he thought necessary to improve the position of the companies in which he invested, often supplying unsolicited business advice to the managers and occasionally attempting to arrange mergers or acquisitions.[4]
 
 
 15
 In addition to selecting financially troubled companies in which to invest, Yaeger increased his gain on his investments by using margin debt. Yaeger financed his purchases by borrowing to the maximum extent allowable under law and the custom of the brokerage houses, which was generally 50 percent. If the value of his stock rose he would use that increased value as equity to support more debt. From time to time Yaeger shifted accounts from one brokerage house to another in order to maximize the volume of margin debt he could carry. Once or twice during his career Yaeger was overleveraged and suffered substantial losses when he was forced to sell enough stock to maintain his margin debt.
 
 
 16
 During the years 1979 and 1980, the ratio of Yaeger's margin debt to portfolio value was 47 percent and 42 percent, respectively. Yaeger's total stock market related debt equalled $42,154,048 in 1979 and $54,968,371 in 1980. When he died, his portfolio was subject to debt in the amount of $70,490,018.
 
 
 17
 In 1979 and 1980 Yaeger reported income in the following amounts on his federal tax return:
 
 
 18
 1979 Character of Income Amount
 Long-term capital gain $13,839,658
 Short-term capital gain 184,354
 Dividends 2,339,080
 Interest 57,958
 -----------
 $16,421,050
 
 
 19
 1980 Character of Income Amount
 Long-term capital gain $1,099,921
 Short-term capital gain 728,404
 Dividends 3,648,441
 Interest 91,717
 Director's fees 10,600
 -----------
 $5,579,083
 
 
 20
 Of the stock which Yaeger sold in taxable years 1979 and 1980, the percentage of total sales of securities which he had held for twelve months or more was 88 percent and 91 percent, respectively. The purchase dates of the securities sold in 1980 ranged from March 1970 to December 1979. In 1979, Yaeger did not sell any security that had been held for less than three months and, in 1980, did not sell any security that had been held for less than six months. On schedule C of the tax returns, Yaeger deducted interest expense in 1979 and 1980 in the amounts of $5,865,833 and $7,995,010, respectively.
 
 
 21
 The sole issue considered by the tax court was whether the claimed deductions of the interest expenses Yaeger incurred in purchasing securities on margin were subject to the limitation on the deductibility of investment interest set forth in section 163(d).[5] This issue turned on whether Yaeger's stock market activities constituted investment activity or the activity of trading in securities as a trade or business. According to the tax court, the "pivotal inquiry" was "whether Yaeger was interested in deriving income from capital appreciation or from short-term trading." The court determined that Yaeger was an investor, not a trader, because Yaeger held his stocks and bonds for lengthy periods of time anticipating that they would appreciate in value. Thus, the interest expense he incurred was "investment interest" within the meaning of section 163(d) and subject to the deductibility restrictions of that section.
 
 B. Discussion
 
 22
 Section 163 of the Internal Revenue Code generally provides for the deduction of interest incurred on indebtedness. As defined in section 163(d)(3)(D), "investment interest" is "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." Section 163(d) limits the deductibility of investment interest by a noncorporate taxpayer to the extent of the taxpayer's investment income, plus $10,000. Any amount disallowed is "treated as investment interest paid or accrued in the succeeding taxable year." 26 U.S.C. Sec. 163(d)(2). Section 163(d) does not apply to interest paid to buy property for personal use or property for trade or business use. See H.R.Rep. 413, pt. 1, 91st Cong., 1st Sess. 72, reprinted in 1969 U.S.Code Cong. & Admin.News 1645, 1719 ("interest on funds borrowed in connection with a trade or business would not be affected by the limitation").
 
 
 23
 The Internal Revenue Code does not define "trade or business." Determining whether a taxpayer's trading activities rise to the level of carrying on a trade or business turns on the facts and circumstances of each case. Higgins v. Commissioner, 312 U.S. 212, 217, 61 S.Ct. 475, 477-478, 85 L.Ed. 783 (1941). In determining whether taxpayers who manage their own investments are traders, "relevant considerations are the taxpayer's investment intent, the nature of the income to be derived from the activity, and the frequency, extent, and regularity of the taxpayer's securities transactions." Moller v. Commissioner, 721 F.2d 810, 813 (Fed.Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984).
 
 
 24
 Investors are engaged in the production of income. Purvis v. Commissioner, 530 F.2d 1332, 1334 (9th Cir.1976). Traders are those "whose profits are derived from the 'direct management of purchasing and selling.' " Moller, supra, at 813 (quoting Levin v. United States, 597 F.2d 760, 765, 220 Ct.Cl. 197 (1979)). Investors derive profit from the interest, dividends, and capital appreciation of securities. See Moller, supra, at 813; Purvis, supra, at 1334; Liang v. Commissioner, 23 T.C. 1040, 1043 (1955). They are "primarily interested in the long-term growth potential of their stocks." Id. Traders, however, buy and sell securities "with reasonable frequency in an endeavor to catch the swings in the daily market movements and profit thereby on a short term basis." Purvis, supra, at 1334 (quoting Liang v. Commissioner, 23 T.C. 1040, 1043 (1955)).
 
 
 25
 Thus, the two fundamental criteria that distinguish traders from investors is the length of the holding period and the source of the profit. These criteria coincide with the congressional purpose behind the enactment of section 163(d), which originated in the Tax Reform Act of 1969, Pub.L. No. 91-172, Sec. 221, 83 Stat. 487. Congress was concerned with the prevalent use of borrowed money to purchase investment assets and the distortion of taxable income that often results when the investments produce long-term capital gain rather than ordinary income.[6] As explained in the House Report accompanying the 1969 Act:
 
 
 26
 The itemized deduction presently allowed individuals for interest makes it possible for taxpayers to voluntarily incur substantial interest expense on funds borrowed to acquire or carry investment assets. Where the interest expense exceeds the taxpayer's investment income, it, in effect, is used to insulate other income from taxation. For example, a taxpayer may borrow substantial amounts to purchase stocks which have growth potential but which return small dividends currently. Despite the fact that receipt of the income from the investment may be postponed (and may be capital gains), the taxpayer will receive a current deduction for the interest expense even though it is substantially in excess of the income from the investment.
 
 
 27
 H.R.Rep. 413, supra, at 73, 1969 U.S.Code Cong. & Admin.News 1718.
 
 
 28
 The activity of holding securities for a length of time to produce interest, dividends, and capital gains fits the abuse targeted by section 163(d): investing for postponed income and current interest deduction.
 
 
 29
 The tax court properly concluded that Yaeger was an investor. It is true that Yaeger initiated over 2000 securities transactions in 1979 and 1980 and pursued his security activities vigorously and extensively. And there is no doubt, as the tax court stated, that Yaeger "maintained a margin of debt which would have caused a more faint-hearted investor to quail." However, "[n]o matter how large the estate or how continuous or extended the work required may be," the management of securities investments is not the trade or business of a trader. Higgins, supra, 312 U.S. at 218, 61 S.Ct. at 478.[7]
 
 
 30
 More importantly, most of his sales were of securities held for over a year. He did not sell any security held for less than three months. He realized a profit on the securities through both dividends and interest. Most of his profit, however, came from holding under valued stock until its market improved. This emphasis on capital growth and profit from resale indicates an investment motivated activity. See Miller v. Commissioner, 70 T.C. 448, 457 (1978). In addition, since the income came from long-term appreciation, Yaeger would receive the benefit of favorable capital gains treatment. To disregard the nature of the income and length of his holdings simply because Yaeger was a vigorous investor would defeat the purpose of section 163(d).[8]
 
 II. NOTICE OF DEFICIENCY
 A. Background
 
 31
 After Yaeger's death on May 11, 1981, form 1040 was filed on his behalf for the short period January 1, 1981 through May 11, 1981. As a new taxpayer, the estate elected April 30 as its fiscal year end and subsequently filed form 1041 for the period May 11, 1981 to April 30, 1982.
 
 
 32
 On April 15, 1983, the tax commissioner issued two notices of deficiency directed to the estate. The first notice specified deficiencies for tax years ending December 31, 1979 and December 31, 1980. The second notice specified a deficiency for tax year ending December 31, 1981. Both notices were accompanied by a waiver form; a statutory notice statement, which explains the adjustments; a statement of income tax changes; an explanation of the adjustments made in these changes; a corrected investment interest expense deduction form (form 4952); and a corrected alternative minimum tax computation form (form 5251). Computations illustrating the corrections accompanied the latter two forms.
 
 
 33
 Yaeger's estate filed a petition in the tax court on July 15, 1983, seeking a redetermination of the deficiencies. In late October, the estate moved the tax court to dismiss for lack of jurisdiction so much of the petition that referred to the calendar year ending December 31, 1981. The basis of the motion was that the notice was invalid since it referred to neither tax year ending May 11, 1981 nor tax year ending April 30, 1982. The tax court granted the estate's motion, noting that its jurisdiction depended upon the commissioner's issuance of a notice of deficiency. 26 U.S.C. Sec. 6214(a), Rule 13(a), Tax Court Rules of Practice and Procedure. The tax court also noted that any error in the notice relating to the tax year would be ignored if the taxpayer was not misled. However, since both the first page and appended computations showed the same wrong year, the tax court found that the estate was unable to determine which taxable year was referred to in the notice.
 
 B. Discussion
 
 34
 The statutory notice of deficiency is often referred to as the taxpayer's "ticket to the tax court." Corbett v. Frank, 293 F.2d 501, 502 (9th Cir.1961); Midland Mortgage Co. v. Commissioner, 73 T.C. 902, 905 (1980); Baron v. Commissioner, 71 T.C. 1028, 1034 (1979). It affords the taxpayer the opportunity to file a petition with the tax court and seek a redetermination of the deficiency. 26 U.S.C. Sec. 6213(a). The commissioner cannot assess, levy, or begin collection proceedings until the notice has been mailed; until the expiration of the taxpayer's time to bring a petition; and, if a petition is brought, until the tax court has made a determination. 26 U.S.C. Sec. 6213(a). Once the petition is brought, the tax court has "jurisdiction to redetermine the correct amount of the deficiency." 26 U.S.C. Sec. 6214(a).
 
 
 35
 The statute does not specify the form or content of the notice. The purpose of the notice "is only to advise the person who is to pay the deficiency that the Commissioner means to assess him; anything that does this unequivocally is good enough." Olsen v. Helvering, 88 F.2d 650, 651 (2nd Cir.1937) (Hand, L., J.). Thus, the notice generally must indicate that a deficiency has been determined and identify the taxpayer, the taxable year involved, and the amount of the deficiency. See, e.g., Scar v. Commissioner, 814 F.2d 1363, 1367 (9th Cir.1987), rev'g on other grounds 81 T.C. 855 (1983); Abrams v. Commissioner, 787 F.2d 939, 941 (4th Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986); Benzvi v. Commissioner, 787 F.2d 1541, 1542 (11th Cir.), cert. denied, 479 U.S. 883, 107 S.Ct. 273, 93 L.Ed.2d 250 (1986); Foster v. Commissioner, 80 T.C. 234 (1983), aff'd in part and vacated in part, 756 F.2d 1430 (9th Cir.1985), cert. denied, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 770 (1986). In short, "[t]he notice must meet the general 'fairness' requirements of due process." Planned Investments, Inc. v. United States, 881 F.2d 340, 344 (1989) (6th Cir.1989).
 
 
 36
 Likewise, mistakes in the content of the notice "which do not frustrate its purpose, are negligible." Olsen v. Helvering, supra, at 651 (Hand, L., J.). The test for determining whether the notice's purpose was accomplished is whether the taxpayer reasonably knew or should have known that the deficiency notice was directed to the taxpayer, that a deficiency determination was made, the taxable year involved, and the amount of the deficiency. This objective standard focuses on whether the taxpayer was justifiably misled or deceived by a mistake in the notice. Thus, "[n]otices containing technical defects are valid where the taxpayer has not been prejudiced or misled by the error and is afforded a meaningful opportunity to litigate" the claims.[9] Planned Investments, Inc. v. United States, supra, at 343 (Penalty assessment notice failed to specify time period involved; held adequate because taxpayer knew from prior dealings with IRS "exactly what the charged conduct was and when it occurred."). See Sanderling, Inc. v. Commissioner, 571 F.2d 174, 176 (3rd Cir.1978) (Since notice covered a time longer than proper period and transaction occurred before end of proper taxable year, taxpayer not misled as to proper year and amount in controversy.); Wood Harmon Corporation v. United States, 206 F.Supp. 773, 777 (1962) (Incorrect date on assessment notice was disregarded since there was no evidence that the taxpayer was "misled by the description of the taxable period."), aff'd, 311 F.2d 918 (2nd Cir.1963); Commissioner v. Forest Glen Creamery Co., 98 F.2d 968, 971 (7th Cir.1938) (Deficiency notice "either must state the taxable period" or "give enough information that the taxpayer reasonably could not be deceived as to the taxable period.").
 
 
 37
 The taxpayer must demonstrate that the notice was misleading. In addition, although the commissioner is not required to indicate the basis for the deficiency determination, see Barnes v. Commissioner, 408 F.2d 65, 68 (7th Cir.), cert. denied, 396 U.S. 836, 90 S.Ct. 94, 24 L.Ed.2d 86 (1969), any statements or computations in or appended to the notice should be considered. Estate of Scofield v. Commissioner, 266 F.2d 154, 167 (6th Cir.1959) (Notice incorrectly stated period but adjustments and computations contained in notice based upon correct period; held notice covered correct year in substance and valid.); Commissioner v. Forest Glen Creamery Co., supra, at 971 (Notice incorrectly indicated tax year 1926 and period ending June 30, 1927; details in attached statement indicated that deficiency determination was for calendar year 1927).
 
 
 38
 The tax court incorrectly confined its inquiry to the date listed on the notice of deficiency and attached computations. The statutory notice states several times that the tax deficiency is due to the "reclassification of your Business Activity from a Trader to an Investor in securities." The statement of income tax changes indicates that the notice of deficiency is for individual income tax form 1040, not fiduciary income tax form 1041. On the investment interest expense deduction form, under the heading "Kind of Return," the box marked "individual" is checked. Thus, the estate clearly knew that the deficiency was calculated for an individual, Yaeger, and not his estate. The estate should have understood that the deficiency related to Yaeger's 1981 tax year, which ended May 11, 1981.[10]
 
 
 39
 In addition, every adjustment in the attachments to the notice of deficiency related to items reported on form 1040 for tax year ending May 11, 1981. In the statutory notice statement, the figures for the self-employment tax, the foreign tax credit, and the alternative minimum tax correspond to Yaeger's form 1040 filed for 1981. The figures in the statement of income tax changes and on the alternative minimum tax computation form are also tied to Yaeger's income tax return for the short period. Indeed, the alternative minimum tax computation form specifies that the figures are taken from certain lines of form 1040.
 
 
 40
 In fact, the estate can only point to one misleading figure, $3,907,422, which is shown on the investment interest expense deduction form as the interest expense on investment debt incurred after September 10, 1975. According to the estate, this figure is misleading because it far exceeds the interest expenses reported on schedule C for form 1040 but is close to, although not identical with, the amount of interest shown on schedule C for the estate's 1041 return. It is true that this figure does not appear on Yaeger's 1040 for the short period. However, it is not clear how this one error, if error it was, confused the estate.
 
 
 41
 The adjustments to Yaeger's income were clearly due to his classification as an investor rather than a trader. His interest expense deduction was thus recalculated. Of necessity, the corrected interest deduction form would contain new figures based on the recalculations. These new figures would include a revised carryover amount from 1979 and 1980, since the deduction for those years was also recalculated. A reasonable taxpayer would not rely solely on one figure in this corrected form to determine which year was being assessed.
 
 
 42
 In addition, a reasonable taxpayer would examine the statement of income tax changes and the computation of the investment income before searching through an unrelated tax form (the estate's 1041) to find one figure. The computation used figures from Yaeger's 1040 and clearly illustrated how the investment income was determined. Line 13 of the interest deduction form reported the allowable deduction as $1,759,567. The statement of income tax changes reported an interest expense carryover of $1,270,194. The need for any carryover at all only makes sense if, as every other objective factor would lead one to believe, the commissioner used the interest expense of $489,373 from Yaeger's 1040 for tax year ending May 11, 1981. The notice of deficiency and its attachments clearly and fairly advised the estate that the commissioner intended to assess it for the short period reported in Yaeger's 1981 return.
 
 CONCLUSION
 
 43
 The order of the tax court dated February 2, 1989 deciding that there is a deficiency due from the taxpayer for taxable years 1979 and 1980 is affirmed. The order dated January 7, 1986 that dismissed so much of the petition that referred to tax year ending 1981 for lack of jurisdiction is reversed and the case is remanded for a trial on the issue of Yaeger's tax liability for the portion of the 1981 tax year ending May 11, 1981.
 
 
 
 *
 Honorable Jacob Mishler, Senior United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.) as amended and in effect during the years in issue
 The Internal Revenue Code has since been redesignated as the Internal Revenue Code of 1986. See Tax Reform Act of 1986, Pub.L. No. 99-514, Sec. 2, 100 Stat. 2085.
 
 
 [2]
 The commissioner's earlier appeal from that order was dismissed as premature by this court in an opinion reported at 801 F.2d 96 (1986). Since a final decision has been rendered regarding the remaining taxable years, the commissioner's appeal is ripe for decision. See Id. at 98
 
 
 [3]
 We follow the tax court in noting that we use such words as "speculate," "trade," "invest," and similar terms for convenience and without intending any inference as the tax characterization or consequences of the facts
 
 
 [4]
 Yaeger's investment strategy produced some startling successes. For example, in 1980 Yaeger invested in Seton Company upon reading in an annual report footnote that one of its divisions had discovered a material that could be used as artificial skin. Years later, the value of the formerly unprofitable stock rose dramatically as the company shifted to manufacturing artificial skin. Similarly, Yaeger purchased bonds issued by the New York, New Haven and Hartford Railroad while the company was in bankruptcy. After the company was reorganized as Penn Central Corporation, Yaeger realized a substantial profit on the bonds
 
 
 [5]
 Section 163(d) provided in pertinent part:
 (1) In general.--In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to--
 (A) $10,000 ..., plus
 (B) the amount of the net investment income ..., plus the amount (if any) by which the deductions allowable under this section ... and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year....
 (D) Investment Interest.
 The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.
 
 
 [6]
 For example, "[a] much publicized study of 154 high income individuals who paid little or no Federal income taxes found that 72 of these individuals benefitted by deducting interest paid on loans taken to acquire growth stock and similar investments the gains on which would constitute capital gains." Miller v. Commissioner, 70 T.C. 448, 453 n. 3, (citing H.R.Rep. No. 413, pt. 1 (1969), 1969 U.S.Code Cong. & Admin.News 1645; 115 Cong.Rec. 22,563, 22,760 (Statement of Rep. Mills), 22,573 (Statement of Rep. Byrnes) (1969))
 
 
 [7]
 See also Groetzinger v. Commissioner of Internal Revenue, 771 F.2d 269, 275 (7th Cir.1985) ("The fact that one person has accumulated more wealth than another ... so that passive investment may command substantially more of the wealthier person's time and attention than that of a poorer counterpart, would not justify allowing the wealthier taxpayer the benefit of trade or business treatment...."), aff'd, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987)
 
 
 [8]
 Our prior decision in Fuld v. Commissioner, 139 F.2d 465 (2d Cir.1943), is not to the contrary. In that case we upheld a tax court determination that the taxpayers were traders and did so on evidence that the taxpayers had made a large number of sales of securities held for less than two years
 
 
 [9]
 The estate notes that the commissioner "is not willing to overlook defects in setting forth the taxable year when the shoe is on the other foot." Pet. brief at 42. The tax court has held that a taxpayer could not amend the petition to include omitted years after the ninety-day time limit even when the notices of deficiency for the omitted years were attached to the petition. 26 U.S.C. Sec. 6213(a). See, e.g., Frazee v. Commissioner, 55 T.C.M. (CCH) 1166 (1988); Hill v. Commissioner, 55 T.C.M. (CCH) 788 (1988). We do not pass on the correctness of these decisions
 
 
 [10]
 The estate argues that the commissioner could have determined that the estate's election to adopt April 30 as its fiscal year was not valid. Thus, when the estate received the notice it might have thought it was being assessed for the period May 11, 1981 to December 31, 1981
 This is not persuasive for two reasons: the notice and its attachments clearly referred to an individual, not an estate; and as a new taxpayer the estate was entitled to chose either a fiscal or calendar year as its tax year. See Title 26, Part 1, section 441-1T(b)(2) (1988).