T.C. Memo. 2015-179

UNITED STATES TAX COURT

TRANSUPPORT, INCORPORATED, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12152-13.                    Filed September 14, 2015.

<u>Michael S. Lewis</u> and <u>William F. J. Ardinger</u>, for petitioner.

<u>Carina J. Campobasso</u> and <u>Kimberly A. Kazda</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies and penalties as

follows:

| [*2] Year | Deficiency | Penalty sec. 6663 |
|---|---|---|
| 1999 | $851,574 | $638,680.50 |
| 2000 | 1,402,030 | 1,051,522.50 |
| 2001 | 1,078,565 | 808,923.75 |
| 2002 | 1,455,383 | 1,091,537.25 |
| 2003 | 977,921 | 733,440.75 |
| 2004 | 1,154,302 | 865,726.50 |
| 2005 | 1,042,719 | 782,039.25 |
| 2006 | 1,598,974 | 1,199,230.50 |
| 2007 | 1,544,646 | 1,117,893.75 |
| 2008 | 1,610,702 | 1,208,026.50 |

The deficiencies and penalties are attributable to adjustments of petitioner's costs of goods sold and officers' compensation and arose from statements made by petitioner and by its shareholder and president, Harold Foote (Foote), when petitioner was offered for sale in 2007. The issue for decision in this opinion is whether respondent has proven fraud by clear and convincing evidence for purposes of the statute of limitations, section 6501(c)(1) and (2), and the section 6663 fraud penalties. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]**                                Introduction

Of the 10 years in issue in this case, assessments for 7 of those years are barred by the statute of limitations absent proof of fraud; and it is this issue that is the subject of this opinion. Twelve witnesses testified over five days, and approximately 135 exhibits were marked, some for identification only. Due to scheduling issues, trial was suspended after introduction of all factual evidence. The only remaining evidence to be considered is expert testimony on the costs of goods sold and reasonable compensation issues, based on previously submitted reports, and cross-examination of experts. The factual findings in this opinion include only those material to our conclusions regarding fraud, and further findings will be necessary if other issues are the subject of a future opinion.

At the conclusion of the factual evidence, the Court commented that respondent had not established fraud by clear and convincing evidence, and the fraud issue should be decided so that the evidence and arguments over costs of goods sold and reasonable compensation would follow a determination of whether 10 years or 3 years remain in issue. Respondent's counsel requested permission to brief the fraud issue. The parties thereafter filed over 400 pages of briefs. The Court's views have not been altered by the posttrial briefs.

**[\*4]**                                    FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in this opinion by this reference. Petitioner's place of business was in New Hampshire when the petition was filed.

Petitioner is a supplier and surplus dealer of aircraft engines and engine parts for use in military vehicles, including helicopters, airplanes, and tanks. It primarily purchased surplus parts from the Government in bulk lots that contained parts having little value as well as parts that petitioner wanted for its business. Petitioner bought the lots to acquire items that it expected to sell but ended up with items that would not be sold. The costs of particular items were not specified as part of the purchase transactions.

Petitioner was also a distributor of parts. The distributorship line of business is referred to in the record as the Goodrich line. Distributorship purchases were of specific parts, and the individual item costs were traceable. The purchased distributorship items were susceptible of accurate inventory accounting, and some computer records were kept in later years; but an accurate inventory was never made part of petitioner's financial and tax reporting.

Foote, its president and chief executive officer, founded petitioner in 1972. During the years in issue Foote and his four sons, William Foote (W. Foote),

[*5] Kenneth Foote (K. Foote), Richard Foote (R. Foote), and Jeffrey Foote (J. Foote) were petitioner's only full-time employees and officers. None of petitioner's officers is an accountant.

In 1999 Foote owned 98% of petitioner's stock. The other 2% was owned by Richard Smith, an unrelated person. As of December 31, 2004, petitioner had issued, and had outstanding, 1,000 shares of class A voting common stock and 9,000 shares of class B nonvoting common stock. On August 8, 2005, Foote transferred 2,250 shares of class B nonvoting common stock to each of his four sons. Accordingly, after this transfer, Foote owned 1,000 shares of class A voting common stock and his four sons each owned 2,250 shares of class B nonvoting common stock.

Starting in the mid-to-late 1970s, petitioner retained Elaine Thompson as its accountant, and she served as petitioner's outside accountant until she died in 2010. Thompson was a certified public accountant (C.P.A.), was a name partner in her firm, and was the first female president of the Connecticut Society of Certified Public Accountants.

Petitioner provided to Thompson handwritten summaries, usually prepared by J. Foote. Thompson, through her accounting firm, prepared compiled financial statements for petitioner for 1990 through 2008. The compiled financial

[*6] statements were based upon the summaries and upon financial information maintained by petitioner. The financial statements were not audited by Thompson or her firm, and the information on the summaries was never verified by Thompson or her firm. In a memorandum dated December 22, 2000, Thompson advised Foote that "any inventory increase creates more income".

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for each of the years in issue. Thompson prepared petitioner's Forms 1120 using the same financial information provided by petitioner in connection with preparation of petitioner's compiled financial statements.

On petitioner's returns the inventory and cost of goods sold amounts were reported as follows:

| Year | Inventory purchases | Ending inventory | Cost of goods sold | Cost of goods sold as a % of sales |
|------|------|------|------|------|
| 1990 | $2,438,837 | $349,036 | $2,411,031 | 70.2% |
| 1991 | 2,411,063 | 504,265 | 2,293,132 | 69.0% |
| 1992 | 5,722,070 | 517,336 | 5,766,439 | 83.2% |
| 1993 | 2,992,018 | 575,808 | 2,989,565 | 71.5% |
| 1994 | 2,889,862 | 595,180 | 2,942,558 | 70.1% |
| 1995 | 5,735,674 | 698,584 | 5,715,005 | 79.6% |
| 1996 | 4,534,762 | 671,351 | 4,635,362 | 72.2% |

| [*7] 1997 | 8,442,613 | 700,851 | 8,466,177 | 80.5% |
|-----------|-----------|-----------|-----------|-------|
| 1998 | 5,025,653 | 725,921 | 5,095,312 | 70.6% |
| 1999 | 4,582,833 | 731,783 | 4,619,035 | 68.0% |
| 2000 | 6,823,574 | 876,651 | 6,749,058 | 69.0% |
| 2001 | 5,653,767 | 1,488,289 | 5,086,870 | 63.5% |
| 2002 | 6,962,709 | 1,232,117 | 7,266,115 | 68.8% |
| 2003 | 5,523,832 | 1,553,889 | 5,264,284 | 64.4% |
| 2004 | 5,643,235 | 1,520,813 | 5,724,397 | 62.4% |
| 2005 | 5,401,471 | 1,389,847 | 5,603,004 | 68.1% |
| 2006 | 7,160,157 | 1,657,697 | 6,951,132 | 66.6% |
| 2007 | 6,510,873 | 1,867,257 | 6,365,543 | 60.7% |
| 2008 | 8,257,286 | 2,662,956 | 7,519,086 | 63.0% |

Costs of goods sold reported as percentages of purchases ranged from 91% for 2008 to over 100% for 1999, 2002, 2004, and 2005.

Petitioner's Forms 1120 for 1982 and 1983 were audited by the Internal Revenue Service (IRS) in 1984. Petitioner's Forms 1120 for 1988, 1989, and 1990 were audited by the IRS in 1992. During each of the audits the examining agent was aware that petitioner did not maintain a physical inventory of the unsold parts in its warehouse and backed into the closing inventory, reported in its returns, by using a percentage of sales as costs of goods sold. The examining

[*8] agent conducting the audit for 1990 was advised that some surplus items had been sold at amounts in excess of 100% gross profit, but he accepted petitioner's representation that, on the basis of Foote's experience in selling the surplus items, petitioner had averaged approximately a 30% gross profit margin. Although the examining agents in each audit informed Foote or petitioner's C.P.A. that petitioner should maintain a physical inventory, the costs of goods sold were adjusted only to reflect a minor change in the purchases that petitioner made in 1983.

In 2000, 2002, 2004, and 2005, petitioner obtained appraisal reports that presented a valuation analysis of the fair market value of petitioner's stock as of December 31, 1999, 2001, 2003, and 2004, respectively. The appraisal reports were obtained in relation to Foote's intent to make gifts of stock to his sons. After the first appraisal Foote attempted to persuade the appraiser to reduce the appraised value because the appraiser's value would make it harder for Foote to give petitioner's stock to his sons. Foote later gave his sons stock valued at the maximum allowed without gift tax liability and arranged for his sons to pay the balance of the purchase price over a period of years. Foote and W. Foote were familiar with the estate and gift tax consequences of such gifts. Foote was also familiar with the marginal income tax rates applicable to him and to his sons.

**[\*9]** On its Forms 1120 for 1999 through 2008, petitioner deducted the following amounts as compensation:

| Officer | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Foote | 478,528 | 593,587 | 538,213 | 538,269 | 428,291 | 513,152 | 213,194 | 353,211 | 478,993 | 599,858 |
| R. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| K. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| J. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| W. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| Others | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 5,952 | 8,366 | 6,323 |
| Total | 1,498,528 | 2,293,587 | 2,168,213 | 2,518,269 | 2,128,291 | 2,553,152 | 1,773,194 | 2,659,163 | 3,187,359 | 3,486,181 |
| Gross sales | 6,796,928 | 9,781,839 | 8,004,622 | 10,563,463 | 8,174,258 | 9,174,563 | 8,227,003 | 10,439,336 | 10,483,854 | 11,943,576 |
| % | 22.047% | 23.447% | 27.087% | 23.839% | 26.037% | 27.829% | 21.553% | 25.473% | 30.403% | 29.189% |

The closing inventory reported on petitioner's Forms 1120 for 1999 through 2008 was: $731,783, $876,651, $1,488,289, $1,232,117, $1,553,889, $1,520,813, $1,389,847, $1,657,697, $1,867,257, and $2,662,956, respectively.

In 2007 Foote considered selling petitioner. On May 3, 2007, petitioner entered into a nondisclosure agreement with Richard Lodigiani of BTS New England, Inc. Foote provided Lodigiani with estimates of inventory and profit margins on surplus parts. Lodigiani prepared several drafts of documents titled "Confidential Offering Memorandum". The drafts were based on information provided by Foote, by J. Foote, and by Thompson. The drafts included a document entitled "Recast Financial Summary", in which the profits of

[*10] petitioner's operations as reported on its financial statements and tax returns were substantially improved. Explanatory notes on the Recast Financial Summary were as follows:

> Five shareholder salaries recast to market rate of $50,000 annually each.
>
> Management has elected to use an accounting method that writes off the majority of inventory as purchased. It is conservatively estimated that actual gross profit on sales exceeds 75% on general part sales and 33% on distributor sales (approx. 20% of sales). Management believes that non-obsolete inventory on hand exceeds $100,000,000.00 at cost. The inventory adjustment shown above adjusts annual gross profit using the formula of 33% x distributor sales and 75% x general parts sales.

Documents prepared by Lodigiani also included an executive summary that included the following statement:

> The company generates average gross profits exceeding 75% on the general parts sales and approximately 33% on the Goodrich distributorship sales. Project 07' [sic] sales are approximately $12,000,000.00. The company operates with no formal marketing and very limited web presence. Growth throughout the world to the thousands of users of these turbine engines is unlimited. The company currently has inventory in excess of $100,000,000.00 at cost with a retail market value that exceeds $500,000,000.00.

> J. Foote provided to Lodigiani a document captioned "Honeywell 2007 T53

Price Book Effective: Jan 1, 2007" (Honeywell list), that listed parts, stock quantities, and extended prices totaling $312,413,888.70, which J. Foote

[*11] represented to be "reasonably accurate". The Honeywell list was prepared by W. Foote, whose duties for petitioner included inventory management. The cost of a single type of nozzle listed on the Honeywell list in petitioner's inventory in 2007 was approximately $800,000. Another sample of items on the Honeywell list in stock in 2007 had purchase prices totaling over $11 million. The lower of cost or market value of the items on the Honeywell list alone far exceeded the total inventory values reported on petitioner's financial statements and tax returns.

Foote also provided prospective purchasers with information about engines in inventory in 2007. The estimated cost of a sample of the engines (identified by Foote in his trial testimony) was approximately $2,440,000, and Foote estimated the retail value at $60 million. By any measure, petitioner's inventory at cost or market value in 2007 far exceeded the inventory values reported on petitioner's correlating financial statements and tax return.

Copies of the documents prepared by Lodigiani were provided to prospective purchasers, including Beran Peter (B. Peter), Patrick Bromley, and Peter LaHaise. Although B. Peter submitted a letter of intent expressing terms for acquisition of 60% of petitioner, no agreements with respect to transfer of petitioner were reached. During his conversations with prospective purchasers, Foote never disavowed the information set forth in the Lodigiani documents.

**[*12]** On February 12, 2008, LaHaise submitted an application for a whistleblower award to the IRS Whistleblower Office. LaHaise and his lawyers met with IRS personnel in relation to his application. LaHaise believes that he could receive $13 million if respondent is successful in this matter.

On January 20, 2009, the IRS commenced an audit of petitioner's returns for 2006 and 2007. The audit was conducted by Revenue Agent Robert Canale. By early October 2009 the audit was expanded to include 1999 through 2005. Petitioner provided invoices and purchase orders to Canale, and Canale toured petitioner's premises. Canale spoke by telephone with Thompson, who was ill and had moved to Illinois, and interacted with one of the members of Thompson's firm. Canale interviewed and obtained documents from Lodigiani, B. Peter, Bromley, and LaHaise.

Frank J. Wojick, Jr., a senior appraiser and valuation specialist for the IRS, was assigned to assist Canale in the audit. Petitioner gave Wojick complete and unlimited access to all of petitioner's business for his review and analysis and welcomed Wojick to its facilities. Wojick toured petitioner's facilities with J. Foote on September 21, 2009. Wojick was permitted to take photographs of the exterior and interior of petitioner's warehouse. Neither Wojick nor Canale attempted to conduct an inventory valuation of the parts in petitioner's warehouse.

[*13] In the notices of deficiency petitioner's costs of goods sold were adjusted to reflect a 25% cost and a 75% profit on petitioner's sales of surplus parts. Compensation to petitioner's officers other than Foote was reduced to reflect a reasonable allowance for their compensation. The notices also determined that all or part of the underpayments of tax were due to fraud or, in the alternative, to the extent that the fraud penalty did not apply, that an accuracy-related penalty under section 6662(a) would apply. The determinations were made on the basis of the admissions in the documents prepared by Lodigiani and statements made to Canale by Foote.

## OPINION

To sustain the 75% penalty provided by section 6663, the Commissioner has the burden of proving by clear and convincing evidence (1) an underpayment of tax and (2) that the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); see, e.g., May v. Commissioner, 137 T.C. 147 (2011), aff'd per order, 2013 WL 1352477 (6th Cir. Feb. 19, 2013); Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

Underpayment of Tax

The parties dispute whether petitioner's costs of goods sold were overstated, resulting in an underpayment of tax. Petitioner's briefs rely in large part on

**[*14]** petitioner's expert's opinions, which have not been received in evidence. During the partial trial the Court indicated substantial problems with the reliability of the expert's reports, even without cross-examination of the experts. Respondent made a motion in limine with respect to petitioner's expert reports on costs of goods sold. That expert did not attempt to conduct a physical inventory or to address the value of parts in petitioner's warehouse. Petitioner has ignored the most compelling evidence in this case that its income and tax for the years in issue were understated, relying instead on retrospective opinions and denials of prior representations by Foote. Even if the expert reports are received in evidence, they have no bearing on the state of mind of petitioner's officers at the relevant times, i.e., when the returns were filed. The experts' opinions will be disregarded and not addressed in this opinion.

Petitioner also criticizes the testimony of respondent's witnesses, particularly LaHaise. Petitioner's proposed findings of fact consist primarily of arguments about the evidence and do not conform to Rule 151(e)(3). Our conclusions are based on our observation of the witnesses and derived from the contemporaneous records created on petitioner's behalf.

Petitioner argues that the consistency in reporting costs of goods sold over the years is evidence of the correctness of its positions. We reject that argument.

[*15] Petitioner argues, without admissible evidence, that the costs of goods sold were consistent with industry averages and were consistent from 1990 through the years in issue. However, the percentages used over the years varied without explanation and, so far as the record reflects, were not based on industry averages or reasoned analysis. Foote testified during trial that petitioner's inventory at cost was close to $100 million, the amount used in the promotional materials provided to prospective buyers. He estimated that as much as 80% of the surplus parts might be scrapped, but his estimates cannot be reconciled with petitioner's tax reporting.

Foote's sons did not provide any helpful testimony on the value of the inventory. K. Foote worked closely with purchases and sales but had "no clue" as to how much the inventory was worth and did not know how costs of goods sold were determined. J. Foote, who acted as petitioner's chief financial officer, testified that he had "no idea" or "not a clue" about petitioner's inventory at cost in 2007. J. Foote provided to petitioner's accountant the numbers used in preparing petitioner's tax returns, but he had no idea whether the amounts reported on the returns were correct or not. W. Foote, whose duties included inventory management, asserted that "nobody understands * * * our inventory" or that

[*16] nobody can put a total valuation on it. As to a specific part in the inventory, he had "no earthly clue" as to the purchase price.

There is no reliable evidence that would enable us to quantify obsolescence although there is credible evidence that many items purchased as part of petitioner's surplus parts operations would never be sold. The totality of the evidence compels the conclusion that petitioner's methodology consistently led to incorrect results. Petitioner failed to keep accurate inventory records, and respondent has proven that a fraction of the actual ending inventory for certain of the years in issue was worth substantially more than was reported on petitioner's tax returns.

If a taxpayer's method of accounting does not clearly reflect income, the computation of taxable income is made by a method that does clearly reflect income. Sec. 446(b). Clear reflection of income is a basic principle of inventory accounting. See secs. 471(a), 472(a); sec. 1.471-2(a)(2), Income Tax Regs. Section 1.446-1(a)(4)(i), Income Tax Regs., provides:

> (i) In all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor, merchandise on hand (including finished goods, work in process, raw materials, and supplies) at the beginning and end of the year shall be taken into account in computing the taxable income of the year. * * *

**[*17]** In this case both parties back into inventory values by first determining costs of goods sold as a percentage of sales. The evidence, however, refutes the result of their method as clearly reflecting income.

We are not persuaded that petitioner realized an average 75% gross profit on all sales of surplus parts. That result is improbable given the nature of petitioner's business, the likelihood that many items will never be sold, and the inherent obsolescence of some of the accumulated collection of parts. Thus we discount the reliability of statements made during the attempts to sell petitioner in 2007, some of which Foote described as "bravado" and Lodigiani described as "puffery". Exaggerated or false representations to a prospective purchaser may indicate lack of trustworthiness, but they are not proof of facts. The objective evidence and the testimony of Foote, however, compel the conclusion that petitioner's methodology did not clearly reflect petitioner's income. Moreover, the proof that some of the ending inventory was consistently understated is clear and convincing evidence that the costs of goods sold were consistently overstated and that taxable income and tax were consistently understated. Respondent has satisfied this element of the burden of proving fraud.

**[*18]** <u>Fraudulent Intent</u>

Respondent must also prove fraudulent intent by clear and convincing evidence. <u>See</u> sec. 7454(a); Rule 142(b). Respondent must show that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes. <u>See</u> <u>Katz v. Commissioner</u>, 90 T.C. 1130, 1143 (1988). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. <u>King's</u> <u>Court Mobile Home Park, Inc. v. Commissioner</u>, 98 T.C. 511, 516 (1992). Fraud will never be presumed. <u>Id.</u>; <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence and inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available. <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 210 (1992).

Respondent argues that fraud has been proven directly in this case and that, therefore, the Court need not rely upon the badges of fraud typically used to determine intent where direct proof of fraudulent intent is unavailable. <u>See, e.g.,</u> <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307 (9th Cir. 1986) (setting forth factors or "badges" of fraud), <u>aff'g</u> T.C. Memo. 1984-601. Respondent's argument, however, rests on the assertion that petitioner realized a 75% gross profit on sales of surplus parts, as claimed by Foote who knowingly represented to petitioner's tax preparer that the gross profit percentage was substantially less. Respondent

**[*19]** relies heavily on the sales materials attributable to petitioner that boasted about the favorable tax results from writing off "the majority of inventory as purchased".  The Recast Financial Summary presented on petitioner's behalf to prospective purchasers assumed a 75% profit on "general part sales" and a nonobsolete inventory on hand exceeding $100 million cost.

We have found that petitioner failed to keep accurate inventory records or records of costs of goods sold and that a fraction of the actual ending inventory for certain of the years in issue was worth substantially more than the ending inventory reported on petitioner's tax returns.  Petitioner's failures of recordkeeping preclude a correct determination of the actual costs of sales and net taxable income, and those failures likely will result in detriment to petitioner.

The statements made orally and in writing to prospective purchasers of petitioner's business by petitioner's representatives are admissions of the taxpayer that may be considered as evidence.  Such admissions are not conclusive, and they are not more likely to be truthful than any other uncorroborated statements of interested persons.  In the context in which they were made, those boastful statements have no more guarantees of truthfulness than the tax return reporting.  The attitude of petitioner's officers was best expressed by W. Foote during his testimony about the Honeywell list:  "Accuracy was not important.  It's a sales

[*20] document.  They can choose to accept it or not accept it, but it's on them to come and actually verify what they think we have versus what we actually have."

The attitude expressed in W. Foote's testimony also characterizes petitioner's treatment of its tax reporting and its positions in this case.  Petitioner's arguments are primarily directed--that is misdirected--at the adequacy of the IRS audits and determinations.  Petitioner argues, without admissible evidence, that the costs of goods sold were consistent with industry averages and were consistent from 1990 through the years in issue; but the percentages used over the years were not the same and, so far as the record reflects, were not based on statistical analysis.  Petitioner's admissions were to the effect that the deducted costs were based on purchases.  The amounts deducted were historically close to the purchases reported during the tax years.  Respondent's reaction in pursuing the fraud penalties is certainly understandable, but the objective evidence of fraudulent intent is simply not clear and convincing.

Throughout the testimony of petitioner's officers are indications that a physical inventory would be too difficult and "not worth the effort" involved.  Without specific and reliable proof that the underpayments that resulted from flawed recordkeeping and accounting were intended to defraud, we do not agree that the statements relied on by respondent constitute direct proof.

**[*21]** We are persuaded that there was a pattern resulting in an underpayment of tax for each year in issue resulting from petitioner's failure to keep accurate records and the undervaluation of ending inventory with consequent overstatement of costs of goods sold. No other badge of fraud, however, is clearly and convincingly established in this case.

Although petitioner was required to and failed to keep inventory records, the nature of its business of acquiring surplus parts through bulk purchases and keeping them for years in the hope that many would ultimately be sold provides a plausible nonfraudulent explanation of those failures. Petitioner's employees did not think that the effort to keep reliable inventories was worth the trouble. They were wrong, and this case should convince them otherwise. However, so far as the record reflects, neither the IRS agents conducting earlier exams nor petitioner's accountant made clear the consequences of failing to do what they should have been doing. No adjustments were made or suggested during the early audits or the annual review by the accountant. So far as the record reflects, petitioner was not clearly advised to find a method to write off obsolete parts as a means of legitimately reducing the inventory value.

There is no convincing evidence that petitioner concealed anything from the examining agents or failed to cooperate, as contended by respondent. The task

**[*22]** of determining the correct numbers was apparently also too difficult for Canale, who simply calculated the unreported income by using 75% of sales on surplus parts as gross profit rather than pursuing more precise records or reconstructions. Neither party purported to conduct tests of the 75% figure or the reported figures until expert reports were prepared shortly before trial. Difficulty does not excuse poor performance, but unreliable evidence undermines the party having the burden of proof.

Respondent also asserts "incredible and inconsistent explanations of behavior and general lack of credibility" as a badge of fraud. Testimony presented by petitioner's owners, officers, and employees, particularly when led by counsel on direct examination, was, not surprisingly, self-serving. To the extent that it would support petitioner's positions and satisfy its burden of proof, that testimony may be unreliable. The Court is not convinced, however, that the testimony is demonstrably false, which is what respondent argues. Petitioner's officers' descriptions of the nature of the business and the difficulties in tracing costs of goods to sales were credible.

The role played by petitioner's accountant in the inaccurate reporting of petitioner's tax liabilities cannot be ignored. Because petitioner's officers provided the amounts incorporated into its tax returns, which were not audited or

[*23] otherwise verified by the accountant, petitioner cannot sustain a claim of good-faith reliance on the accountant sufficient to avoid the section 6662(a) penalty resulting from a substantial understatement of tax or negligence, and that is an appropriate penalty in this case. Acquiescence in petitioner's methodology by its well-credentialed C.P.A., which apparently satisfied successive IRS examiners, may well have lulled petitioner's principals into thinking that what they were doing would pass muster for tax reporting purposes even if the economics of the business were better than reported. In this context, their open and puffing statements to prospective purchasers are reconcilable with their current explanations. There is no clear and convincing evidence to the contrary.

The admissions made in petitioner's promotional materials establish that petitioner's officers and shareholders knew that the ending inventory was substantially undervalued. Those materials openly asserted that the accounting method used allowed current writeoffs of purchases during the year, and they boasted of a gross profit percentage far in excess of that reported on petitioner's tax returns. Those claims, however, were not concealed. Respondent argues that these same admissions were repeated to respondent's agents during the examination. Petitioner's methodology had been used for years notwithstanding two prior audits and petitioner's use of a well-qualified accountant who knew or

[*24] should have known that petitioner did not keep physical inventories. Petitioner's officers expected that they could continue with the practices that had gone unchallenged for so long, and apparently they justified the practices in their own minds by the difficulties of determining accurate inventories.

Contrary to petitioner's contentions, petitioner's officers were not unsophisticated about tax matters. They well understood, for example, estate planning concepts. We do not believe that Foote did not know the difference between profit margins and markups. We do not believe that petitioner's officers were unaware of the overly favorable tax results that they were claiming, and the boasting to prospective purchasers demonstrates knowledge that petitioner's economic income exceeded petitioner's reported taxable income. We are not persuaded, however, that the clear and convincing evidence of underpayments also establishes fraudulent intent.

As stated in a frequently quoted opinion of this Court: "[T]his case epitomizes the ultimate task of a trier of the facts--the distillation of truth from falsehood which is the daily grist of judicial life." Diaz v. Commissioner, 58 T.C. 560, 564 (1972). A judge has a prerogative and a duty to reach an opinion after consideration of the facts. Interex, Inc. v. Commissioner, 321 F.3d 55, 60 (1st Cir. 2003), aff'g T.C. Memo. 2002-57. After carefully considering the testimony of

**[*25]** the witnesses, the exhibits, and the arguments of the parties, the Court concludes that the evidence falls short of clear and convincing as to fraudulent intent. This conclusion is not a vindication of petitioner or its officers.

The actions or inactions of petitioner's accountants and the IRS auditors, however, included no clear warnings to petitioner that its conduct was illegal or fraudulent. To the extent that none of these professionals undertook the task of determining petitioner's correct income, they were complicit in the duration of the improper reporting. This case is before the Court only because the IRS' acquiescence in petitioner's methodology ended when a whistleblower saw an opportunity for an informant's reward.

Because fraud has not been established, assessments for 1999 through 2005 are barred by section 6501(a). To allow for the disposition of the costs of goods sold and reasonable compensation issues for 2006, 2007, and 2008,

<u>An appropriate order</u>

<u>will be issued</u>.