T.C. Memo. 2015-205

UNITED STATES TAX COURT

WILLIAM F. POPPE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23124-12.                          Filed October 19, 2015.


<u>Kamelia K. Poppe</u>, for petitioner.

<u>Jane J. Kim</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine respondent's determination of a deficiency in his Federal income tax for the 2007 tax year and additions thereto under sections 6651(a)(1)[1] and (2) and 6654.

_____

[1]Unless otherwise indicated, section references are to the Internal Revenue

(continued...)

[*2]   On March 23, 2015, the parties filed a stipulation of settled issues which resolved most issues raised in the notice of deficiency issued on June 21, 2012.[2] Respondent conceded that there is no issue of previously unreported dividend or interest income before the Court.  The remaining issues before the Court are as follows:

1.  whether petitioner is entitled to use the mark-to-market accounting method under section 475(f) for the 2007 tax year to report his securities and trading activity on the basis of an election petitioner purportedly made on April 15, 2003.  We hold he is not;

2.  whether petitioner is liable for additions to tax under sections 6651(a)(1) and (2) and 6654 where he claims he failed to file his Federal income tax returns

---

[1](...continued)
Code (Code) applicable to the relevant years, and Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are rounded to the nearest dollar.

[2]Specifically, the parties stipulated that for tax year 2007:  (1) petitioner's adjusted gross income should not be increased by $450,000 in IRA distributions and petitioner's tax is not increased by 10% of a premature distribution; (2) petitioner is entitled to a capital loss deduction of $3,000; (3) petitioner received $1,792 of taxable interest and $474 of tax-exempt interest; (4) petitioner received $45 of ordinary dividends and $244 of qualified dividends; (5) petitioner received $3,000 in nonemployee compensation from Z Seven Fund, c/o Gemini Fund Services, LLC; (6) petitioner is entitled to a withholding credit of $578; and (7) petitioner is entitled to a standard deduction for one individual of $5,350.

[*3] timely because he suffered from an autistic spectrum disorder (ASD) previously known as Asperger's Syndrome. We hold he is.

FINDINGS OF FACT

The facts set forth below are based on the pleadings and other pertinent materials of the record. Some of the facts have been stipulated. The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein, and we find those facts accordingly. Petitioner resided in New York when the petition was timely filed on September 17, 2012. Absent a stipulation to the contrary, an appeal of this case would lie in the Court of Appeals for the Second Circuit.

Petitioner graduated from the U.S. Merchant Marine Academy in 1980 with a double major in marine engineering and nautical science and received a third assistant engineer's license and a third mate's license from the U.S. Coast Guard. Petitioner worked as a stock broker from 1983 to 1991 and was a registered and licensed securities representative. In 1996 petitioner received a master's degree in computer science from Hofstra University.

From 2001 to 2006 petitioner worked as a high school mathematics teacher in New York City. To help support himself and his family, from 2002 through 2006 petitioner conducted trades through a personal trading account with Fidelity

[*4] Investments (Fidelity). Petitioner used his personal funds for trading.[3] During the school year, petitioner traded every day during the two free school periods and devoted substantial time--four to five hours a day--to researching his trades. Petitioner testified that some of his trades were short-term trades for options with monthly expiration and some of the trades were stocks. Although petitioner occasionally received dividends on stocks he traded, those dividends were incidental. Petitioner claims his intent was to make short-term trading profits. Petitioner testified he executed about 60 trades per month.

In 2003 on the advice of his accountant, petitioner intended to file a section 475(f) mark-to-market election. Petitioner, however, did not retain a signed copy of any election or any evidence of mailing it. Petitioner filed his Federal income tax return for the tax year 2003 on July 25, 2005. The 2003 tax return contained a statement that petitioner had made an election pursuant to section 475(f), but did not have a copy of Form 3115, Application for Change in Accounting Method, attached to it. Out of the $370,235 gross income reported on the 2003 tax return, $38,462 came from wages, $162,530 from interest, $11,207 from dividends received, $15,758 from capital gains, and $142,278 from business income from

---

[3]The Fidelity account had approximately $1.2 million in personal funds, but petitioner confirmed he rarely used all of that money for trading. A portion of the account was just earning interest.

**[*5]** securities trading reported on Schedule C, Profit or Loss From Business. Petitioner indicated on the tax return that his occupation for 2003 was teacher.

Beginning in October 2006 petitioner became a full-time trader associated with Madison Proprietary Trading Group, LLC (MPTG).[4] MPTG provided petitioner with access to a Goldman Sachs Execution and Clearing (GSEC) account and an office space to conduct his trades. During 2007 petitioner traded daily on business days, excluding two business days in May 2007. Petitioner had over 400 trades per month, excluding May 2007, for which he had a total of 373. The year 2007 GSEC statements show that petitioner's totals for 2007 were $95,743,282.27 in securities purchased and $85,979,146.40 in securities sold, with P&L bookings by Cusip[5] as of December 31, 2007, showing a loss of $1,086,790. The parties stipulated that all transactions and capital in the GSEC account belonged to petitioner.

---

[4]Petitioner was deemed a "Class B Member" of MPTG according to the side letter issued to petitioner sometime in September 2006.

[5]The parties stipulated that P&L bookings by Cusip is the yearend calculation showing realized and unrealized gains and losses. It is standard for Goldman Sachs account statements and is used to clear or reset the account for the new year.

**[\*6]**  In 2012 respondent prepared and filed a substitute for petitioner's 2007 Federal income tax return and on June 21, 2012, issued a notice of deficiency which forms the basis of this case.

On April 15, 2013, petitioner filed a 2007 tax return.  Petitioner also subsequently submitted an amended 2007 tax return with a signature date of April 15, 2014.  On the 2007 tax return, petitioner reported a loss of $1,182,487 on a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., allegedly filed on his behalf by MPTG.  The Schedule K-1 was attached to the 2007 tax return.  Respondent cross-checked MPTG's tax year 2007 Form 1065, U.S. Return of Partnership Income, which included Schedules K-1 for its partners.  MPTG's 2007 return did not include a Schedule K-1 for petitioner.  Respondent also checked the tax year 2007 Form 1065 for MT Trading, LLC, a second-tier partnership of MPTG, and it also had no Schedule K-1 for petitioner.  In the amended 2007 tax return, petitioner corrected amounts of short-term and long-term capital gains and losses and included a statement to the effect that under section 475(f) he is entitled to the mark-to-market accounting method and plans to carry forward the losses incurred in 2007.

At all relevant times, petitioner suffered from an ASD previously known as Asperger's Syndrome.  Until 2003 petitioner filed his tax returns timely with the

[*7] assistance of his wife. In 2002 and 2003 petitioner retained a certified public accountant to assist him with tax matters. Petitioner understood he had a duty to file tax returns but claims that in 2007 he was "despondent" because of the losses he suffered and could not organize himself to file a tax return timely.

OPINION

I.    Eligibility for the Mark-to-Market Treatment of the 2007 Loss

    A.    Background

Petitioner claims that in 2003 he made an election under section 475(f) allowing him to use the mark-to-market method of accounting, and so a loss he sustained in 2007 should be treated as a net operating loss. This treatment would allow petitioner to shield from taxation some prior and future trading gains. Respondent argues that the 2007 trading loss is not entitled to the mark-to-market treatment because petitioner failed to meet the requirements for a valid election under section 475(f).

In general, section 475(f)(1) provides that a taxpayer engaged in a trade or business as a trader in securities may elect to apply the mark-to-market method of accounting to securities held in connection with such trade or business. The mark-to-market method allows a trader in securities to recognize gain or loss on any security held in connection with the trade or business at the close of the taxable

**[*8]** year as if the security were sold for its fair market value at the end of the year. Sec. 475(f)(1)(A)(i); <u>Knish v. Commissioner</u>, T.C. Memo. 2006-268; <u>Chen v. Commissioner</u>, T.C. Memo. 2004-132.

The gains or losses attributable to the securities covered by the mark-to-market provisions are treated as ordinary income or loss. <u>See</u> sec. 475(f)(1)(D), (d)(3). If a taxpayer is entitled to make and timely makes an election under section 475(f), any net loss from the business of trading in securities will be an ordinary loss deductible in full under section 165(c)(1). If the election is not made, any net loss is deductible only to the extent of any capital gains plus $3,000. <u>See</u> secs. 165(a), (c), (f), 1211(b)(1). Rev. Proc. 99-17, 1999-1 C.B. 503, provides a procedure for making an election under section 475(f). Once the election is made, use of the mark-to-market method continues for all subsequent taxable years unless the election is revoked with the consent of the Commissioner. Rev. Proc. 99-17, sec. 4, 1999-1 C.B. at 504.

B.    <u>Burden of Proof</u>

Petitioner argues that the burden of proof should be shifted to respondent under section 7491(a) because petitioner produced credible evidence and satisfied the requirements of section 7491(a)(2) with respect to the issue of whether

**[*9]** petitioner is entitled to use the mark-to-market accounting method for his 2007 trading loss.

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a)(1), the burden of proof shifts to the Commissioner, subject to certain limitations, where a taxpayer introduces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's tax liability if the taxpayer introduces credible evidence regarding the issue. See Ashley v. Commissioner, T.C. Memo. 2000-376.

Section 7491(a)(1) applies with respect to a factual issue only if the requirements of section 7491(a)(2) are satisfied. Section 7491(a)(2) requires that a taxpayer maintain all records required by the Code and cooperate with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews.

Petitioner raised the issue of eligibility of the 2007 loss for the mark-to-market treatment in his amended petition filed after the trial. Petitioner cooperated with respondent to resolve the issues raised in the notice of deficiency. However, he filed his 2007 tax return many years after it was due and did not retain the

[*10] records relating to the alleged mark-to-market election. Respondent argues that when the only evidence available to the Court is petitioner's self-serving testimony, that evidence does not meet the credibility standard set out in section 7491(a)(1). We agree with respondent. Because petitioner failed to keep adequate records and did not file a tax return until after the notice of deficiency was issued to him, the burden of proof is on petitioner with respect to eligibility, the effectiveness of the mark-to-market election, and the 2007 loss treatment.

C.    Petitioner's Entitlement To Make a Mark-to-Market Election in 2003

The first issue we consider to determine whether petitioner is entitled to use the mark-to-market accounting method in 2007 is whether petitioner was entitled to make a mark-to-market election in 2003. Section 475 identifies being a trader in securities as a prerequisite to filing the mark-to-market election.

The Code does not define the term "trade or business". Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987); Estate of Yaeger v. Commissioner, 889 F.2d 29, 33 (2d Cir. 1989), aff'g in part, rev'g and remanding in part T.C. Memo. 1988-264. Whether a taxpayer's securities activities during the years in issue constituted a trade or business is a question of fact. Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Estate of Yaeger v. Commissioner, 889 F.2d at 33; Paoli v. Commissioner, T.C. Memo. 1991-351.

**[*11]** In determining whether a taxpayer in a securities activity is engaged in a trade or business, courts have distinguished between "traders", who are in a trade or business, and "investors", who are not. Mayer v. Commissioner, T.C. Memo. 1994-209 (citing Moller v. United States, 721 F.2d 810, 813 (Fed. Cir. 1983)). Management of securities investments, whatever the extent and scope of such activity, is seen as the work of a mere investor, "not the trade or business of a trader." Id. (quoting Estate of Yaeger v. Commissioner, 889 F.2d at 34); see also Whipple v. Commissioner, 373 U.S. 193, 202 (1963); Higgins v. Commissioner, 312 U.S. at 217; Paoli v. Commissioner, T.C. Memo. 1991-351. This result is the same notwithstanding the amount of time the individual devotes to the activity. Mayer v. Commissioner, T.C. Memo. 1994-209. Even "full-time market activity in managing and preserving one's own estate is not embraced within the phrase 'carrying on a business,' and * * * salaries and other expenses incident to the operation are not deductible as having been paid or incurred in a trade or business." Commissioner v. Groetzinger, 480 U.S. at 30; Mayer v. Commissioner, T.C. Memo. 1994-209. Instead, an investor's expenses are deductible under section 212 as incurred in the production of income.

In determining whether a taxpayer who manages his own investments is a trader, nonexclusive factors to consider are (1) the taxpayer's investment intent,

**[\*12]** (2) the nature of the income to be derived from the activity, and (3) the frequency, extent, and regularity of the taxpayer's securities transactions. Moller, 721 F.2d at 813. Thus, a taxpayer's activities constitute the trade or business of trading only where both of the following are true: (1) the taxpayer's trading is substantial and (2) the taxpayer seeks to catch the swings in the daily market movements and to profit from these short-term changes, rather than to profit from the long-term holding of investments. Mayer v. Commissioner, T.C. Memo. 1994-209.

As to the first requirement, "substantial" means frequent, regular, and continuous enough to constitute a trade or business. Holsinger v. Commissioner, T.C. Memo. 2008-191. Sporadic trading does not constitute a trade or business. Commissioner v. Groetzinger, 480 U.S. at 35; Mayer v. Commissioner, T.C. Memo. 1994-209. The number of trades executed in a year and the amount of money traded are helpful in determining whether a taxpayer's trading activity was "substantial". Holsinger v. Commissioner, T.C. Memo. 2008-191.

As to the second requirement, a trader's activities must seek profit from short-term market swings, unlike those of an investor who seeks capital appreciation and income and who is usually not concerned with short-term market developments that would influence prices on the daily market. Paoli v.

[*13] Commissioner, T.C. Memo. 1991-351.  Courts also look at whether the taxpayer's securities income is principally derived from frequent sales of securities, rather than from dividends, interest, or long-term appreciation.  Moller, 721 F.2d at 813; King v. Commissioner, 89 T.C. 445, 458-489 (1987); Liang v. Commissioner, 23 T.C. 1040, 1043 (1955); Mayer v. Commissioner, T.C. Memo. 1994-209.

Petitioner meets the first prong of the two-part test outlined above.  In 2003 petitioner executed about 60 trades each month, for a total of approximately 720 trades per year.  Petitioner's trading was not sporadic.  Petitioner testified that he devoted a significant amount of time to the trading activities during the school year--four to five hours every trading day--and always traded on the last hour of the day, when there is a lot of activity on the market.  During the summer, petitioner spent 10 to 12 hours a day on his trading activities.  Petitioner had prior experience as a stock broker.  Petitioner also had a substantial amount of trading activity in 2002, which prompted him to think of making a mark-to-market election under section 475(f) for 2003.  We find petitioner's trading was sufficiently frequent, regular, and continuous to constitute a trade or business.

As to the second prong of the test, petitioner testified that his intent with respect to trading in 2003 was to profit from short-term market swings.

**[\*14]** Petitioner's testimony during the trial was organized and coherent, providing sufficient details on petitioner's trading strategy. We find persuasive petitioner's testimony on the issue of intent.

In addition to petitioner's intent, we look to the two fundamental criteria that distinguish traders from investors: the length of the holding period of the securities and the source of the profit. Estate of Yaeger v. Commissioner, 889 F.2d at 33; Mayer v. Commissioner, T.C. Memo. 1994-209. Petitioner testified that his trading consisted largely of short-term stocks and monthly options, with a holding period of less than one month in a margin account funded with his own money. Petitioner's 2003 tax return shows that only 10.4% of his gross income came from his teaching wages while 38.4% came from trading in securities. Another 43.8% of petitioner's income in 2003 came from interest income, and approximately 8% came from dividends and long-term capital gains. We note, however, that the high percentage of interest income is unusual for petitioner, as in the prior and following years petitioner reported significantly lower interest income numbers.[6] Thus, it is not indicative of whether petitioner was a trader or

---

[6]The large amount of interest income reported in 2003 is only partially attributable to the money petitioner held in the Fidelity trading account. Over 50% of the interest income is attributable to payments from Jonathan C. Poppe, likely petitioner's relative.

[*15] an investor in 2003. When petitioner's income from trading activities was almost four times more than his wages from teaching--his primary occupation in 2003--there is very little doubt that petitioner met the second prong of the test. Thus, we conclude that petitioner was a trader in securities in 2003 and was entitled to make an election under section 475(f) for a mark-to-market accounting method.

D.     Election Under Section 475(f)

The second issue we consider is whether petitioner made a proper election under section 475(f) in 2003.

A securities trader electing under section 475(f) to use the mark-to-market method of accounting for securities held in the business is generally required to file with the Commissioner a statement making the mark-to-market election, identifying the first taxable year for which the election is effective and describing the business to which the election relates. See Kantor v. Commissioner, T.C. Memo. 2008-297; Knish v. Commissioner, T.C. Memo. 2006-268; Lehrer v. Commissioner, T.C. Memo. 2005-167, aff'd, 279 F. App'x 549 (9th Cir. 2008); Rev. Proc. 99-17, sec. 5.03(1), 1999-1 C.B. at 504. The statement must be filed no later than the due date of the trader's original Federal income tax return (without regard to extension) for the taxable year immediately preceding the election year,

**[\*16]** and if the election entails a change in accounting method, the trader must also attach a Form 3115, Application for Change in Accounting Method, to the trader's timely filed original Federal income tax return for the election year. Rev. Proc. 99-17, sec. 5.03(1), 5.04, 1999-1 C.B. 504, 505. This Court has on several occasions held that a securities trader failed to make an election under section 475(f) where the trader did not follow the election requirements of Rev. Proc. 99-17, supra. Kohli v. Commissioner, T.C. Memo. 2009-287; Kantor v. Commissioner, T.C. Memo. 2008-297; Knish v. Commissioner, T.C. Memo. 2006-268.

We find that petitioner failed to comply with the requirements for the mark-to-market election set out in Rev. Proc. 99-17, supra. The evidence does not show conclusively whether petitioner signed or mailed a Form 3115 in 2003. Petitioner did not submit a copy of any executed version of Form 3115 or any evidence of mailing it. Respondent did not find any record of petitioner's Form 3115 in his electronic database, but also admitted that in some years not all Forms 3115 received were actually entered in the database. Next, petitioner filed his Federal income tax return for 2003 on July 25, 2005, failing to comply with the filing deadlines. The 2003 tax return contained a statement that petitioner made an

[*17] election pursuant to section 475(f), but did not have a Form 3115 attached to it. Thus, petitioner did not comply with the requirements of Rev. Proc. 99-17, supra.

Petitioner argues we should find that he made a valid section 475(f) election under the substantial compliance doctrine.[7] The substantial compliance doctrine has no place in determining whether a timely section 475 (f) election has been made. Kohli v. Commissioner, T.C. Memo. 2009-287. Rev. Proc. 99-17, supra, fixes a deadline by which the election must be made and the requirements for the election. Because petitioner failed to comply with the requirements of Rev. Proc. 99-17, he did not make an effective mark-to-market election in 2003.[8]

---

[7]The substantial compliance doctrine is a narrow equitable doctrine that courts use to avoid taxpayer hardship if the taxpayer establishes that he or she intended to comply with a provision, did everything reasonably possible to comply with the provision, but did not comply with the provision because of a failure to meet the provision's specific requirements. Kohli v. Commissioner, T.C. Memo. 2009-287, slip op. at 7 n.4; see also Sawyer v. Cty. of Sonoma, 719 F.2d 1001, 1007-1008 (9th Cir. 1983); Fisher Indus., Inc. v. Commissioner, 87 T.C. 116, 122 (1986), aff'd, 843 F.2d 224 (6th Cir. 1988).

[8]The Commissioner may grant administrative relief to a securities trader with regard to an improper mark-to-market election if the trader, among other things, requests sec. 9100 relief and demonstrates that he acted reasonably and in good faith in failing to make a timely election under sec. 475(f). See Vines v. Commissioner, 126 T.C. 279, 290-291 (2006); sec. 301.9100-3, Proced. & Admin. Regs. A taxpayer must request relief through a private letter ruling, in a petition, or in a refund claim. See Knish v. Commissioner, T.C. Memo. 2006-268 (relief

(continued...)

[*18] Assuming for the sake of argument that the substantial compliance doctrine did apply in this case, it would not change the outcome. Petitioner failed to meet all of the requirements set out in Rev. Proc. 99-17, supra, except one. Petitioner failed to show that he attached and timely mailed a Form 3115 with his 2003 tax return and that he timely filed the 2003 tax return. The only indication that petitioner made an election in 2003 is a statement attached to the 2003 tax return; but this statement alone is insufficient to meet the requirements. Petitioner was aware of the election requirements and did not challenge the validity of Rev. Proc. 99-17, supra. Under these circumstances, the substantial compliance argument would not save the day.

E.    Amount of Loss and Petitioner's Status at MPTG

The parties disagree as to the amount of petitioner's loss that would be eligible for mark-to-market treatment in 2007. Because petitioner is not entitled to use the mark-to-market accounting method in 2007, this dispute is moot. Petitioner's gains or losses arising out of his trading through MPTG should be

---

[8](...continued)
denied where request not made in petition); Marandola v. United States, 76 Fed. Cl. 237 (2007). Petitioner, however, did not request such relief. Therefore, we do not consider this issue.

[*19] calculated under the rules for capital gain/loss calculation, not the mark-to-market approach.

Further, petitioner maintains he was a partner at MPTG in 2007, but he never argued in the briefs or introduced any evidence as to whether MPTG itself made the mark-to-market election so its partners could avail themselves of the election benefits. This argument is thus deemed waived. In addition, the record is inconclusive on whether MPTG treated petitioner as a partner. The side letter says the petitioner was a class B member and a party to the MPTG operating agreement. Petitioner, however, did not introduce into evidence the MPTG operating agreement itself. According to the side letter, the mutual obligations of MPTG and petitioner were very limited. MPTG created a trading account for petitioner and provided him with an office space to trade and access to the trading platform. Petitioner, in turn, fully funded his trading account and was obligated to split the trading profits 90%/10% with MPTG. The side letter does not discuss capital contributions by petitioner to MPTG itself, only to petitioner's trading account. The side letter is also silent as to the extent of petitioner's partnership interest in MPTG and share of MPTG's gains and losses. The preliminary Schedule K-1 that petitioner obtained from one of MPTG's employees does not match the MPTG 2007 tax return, which does not list petitioner as a partner and

[*20] does not include a Schedule K-1 for him. On the basis of the limited facts available to the Court, we conclude that petitioner did not meet his burden of proof on the issue of whether he was a partner in MPTG.

F.     Conclusion

For the reasons stated above, petitioner is not entitled to treat the 2007 trading loss as a net operating loss. Petitioner failed to meet the requirements for a valid election. Thus, the securities trading loss petitioner suffered in 2007 is a capital loss, not an ordinary one.

II.     Additions to Tax Under Section 6651(a)(1) and (2)

Section 6651(a)(1) imposes an addition to tax for failure to file a return when due. The addition equals 5% for each month that the tax return is late, not to exceed 25% in total. Section 6651(a)(2) imposes a corresponding addition to tax for failing to pay timely the tax shown to be due on a Federal income tax return. The amount of the addition to tax for failure to pay timely equals 0.5% for each complete or partial month a taxpayer fails to pay the tax, not to exceed 25% in the aggregate. Id. The additions to tax for failure to both file and pay timely do not apply where the failures were due to reasonable cause and not to willful neglect. Sec. 6651(a)(1) and (2).

**[\*21]** The Commissioner has the burden of production with respect to the liability of an individual for additions to tax under section 6651(a)(1) and (2). See sec. 7491(c); see also Rule 142(a)(1). The burden of showing reasonable cause under section 6651(a) remains on the taxpayer. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Respondent has met his burden of production by demonstrating that petitioner filed his return late and failed to pay on time.

"Reasonable cause" requires the taxpayer to demonstrate that he exercised ordinary business care and prudence and nevertheless was unable to file his or her Federal income tax return by the due date. See United States v. Boyle, 469 U.S. 241, 246 (1985); sec. 301.6651-1(c), Proced. & Admin. Regs. Willful neglect is defined as a "conscious, intentional failure or reckless indifference." Boyle, 469 U.S. at 245-246. The existence of willful neglect or reasonable cause is a factual determination to be made in the light of well-established legal principles. Id. at 249 n.8. We synthesize our discussion of reasonable cause under section 6651(a)(1) and (2) because the standard has been interpreted to be the same. See E. Wind Indus., Inc. v. United States, 196 F.3d 499, 504 n.5 (3d Cir. 1999); Russell v. Commissioner, T.C. Memo. 2011-81.

Reasonable cause may exist if the taxpayer's or a family member's illness or incapacity prevents the taxpayer from filing his or her tax return, but not if the

[*22] taxpayer is able to continue his or her business affairs despite the illness or incapacity. See Timbarella v. Commissioner, 139 F. App'x 319 (2d Cir. 2005), aff'g T.C. Memo. 2004-47; McLaine v. Commissioner, 138 T.C. 228 (2012); Hardin v. Commissioner, T.C. Memo. 2012-162; Ruggeri v. Commissioner, T.C. Memo. 2008-30. In Hardin v. Commissioner, slip op. at 5, the taxpayer suffered from a mild to moderate form of attention deficit hyperactivity disorder (ADHD), as well as posttraumatic stress syndrome and bipolar disorder. Because of these conditions, the taxpayer had difficulty concentrating, being organized, and completing tasks. Id. at 5. The Court held that these conditions did not rise to the level of reasonable cause when the taxpayer was able to manage his business affairs, including managing two rental properties, selling one of them, and being employed full time as an engineer. Id. at 7-8. In McLaine v. Commissioner, 138 T.C. at 247-248, the Court held that the taxpayer's alcoholism did not constitute reasonable cause for failing to file a tax return on time when the taxpayer understood he had a tax liability and tried to take steps to pay the tax, such as borrowing against or selling some of his assets.

Petitioner alleges that his mental impairment--an ASD previously known as Asperger's Syndrome--constitutes reasonable cause for purposes of section 6651(a)(1) and (2). Petitioner offered testimony of a fact witness, Lynda Geller,

[*23] Ph.D., to confirm his diagnosis. Mrs. Geller is a licensed psychologist in the State of New York but is not a medical doctor. Mrs. Geller has been petitioner's psychologist since June 2013 and has been seeing petitioner approximately once a month. Mrs. Geller testified that the condition petitioner suffered from was a chronic, pervasive, lifelong neurological disorder that manifests itself in impairment of some executive functions, poor social cognition, and high dependence on routines. Mrs. Geller also opined that petitioner did not fully appreciate the seriousness of his failure to file his tax returns. We note that Mrs. Geller was not petitioner's treating healthcare provider in 2003 or 2007, the years at issue, and is not a medical doctor. For these reasons, we give her testimony minimal weight.

Petitioner's situation is similar to that of the taxpayer in Hardin who had difficulty with concentrating, organizing, and completing tasks because of ADHD, posttraumatic stress syndrome, and bipolar disorder. Petitioner argues that because of his mental condition he was not able to organize his affairs and file the tax return timely in 2007. However, as in Hardin, that mental condition did not prevent petitioner from engaging in activities that required a high degree of concentration and ability to analyze and organize information.

[*24] For a number of years, including 2002 and 2003, petitioner worked as a high school teacher. There is no evidence in the record that at any time from 2001 through 2006 petitioner filed for a disability accommodation while he was employed as a school teacher. In 2007 petitioner was trading in securities. Petitioner's work station was equipped with six monitors showing the status of his trades. Petitioner was able to collect, analyze, and organize information to base his trades on. Petitioner understood he had a duty to file tax returns but claims that in 2007 he was "despondent" because of the losses he suffered and could not organize himself to file a tax return timely.

We are sympathetic to petitioner's plight. We cannot find, however, under these circumstances that petitioner's mental condition prevented him from managing his business affairs. Thus, petitioner's failure to file the 2007 tax return timely and pay any taxes due on said return was not due to reasonable cause. Petitioner is liable for additions to tax under section 6651(a)(1) and (2).

III.    Addition to Tax Under Section 6654(a)

Section 6654 imposes an addition to tax for failure to pay estimated tax where prepayments of tax, either through withholding or by making estimated quarterly payments during the year, do not equal the lesser of 90% of the tax shown for the current taxable year or 100% of the tax shown for the previous

**[*25]** taxable year. Section 6654(e) provides some exceptions to the general rule where the tax is a small amount (less than $1,000), where there was no liability for the preceding taxable year, or a waiver applies. Sec. 6654(e)(1)-(3). A taxpayer may qualify for a waiver in two sets of circumstances: (1) the Commissioner determines that by reason of casualty, disaster, or other unusual circumstances the imposition of an addition to tax would be against equity and good conscience, and (2) a taxpayer retires after having attained the age of 62 or becomes disabled in the taxable year for which estimated payments were required to be made, or in the taxable year preceding that taxable year when an underpayment was due to reasonable cause and not to willful neglect. Sec. 6654(e)(3).

The Commissioner bears the burden of production to show that the taxpayer had an estimated tax payment obligation. The burden includes showing whether a return was filed for the preceding year. Sec. 7491(c); Wheeler v. Commissioner, 127 T.C. 200, 211-212 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). Petitioner bears the burden of persuasion with respect to any defenses or exceptions. See Higbee v. Commissioner, 116 T.C. at 446.

Because petitioner did not file his tax return for the tax year 2006 until November 5, 2012, he was required to make estimated payments equal to 90% of his tax for the 2007 tax year. See sec. 6654(d)(1)(B); Hardin v. Commissioner,

[*26] T.C. Memo. 2012-162; Evans v. Commissioner, T.C. Memo. 2010-62. The record shows that the amount of petitioner's estimated payments in 2007 was less than the determined tax liability for the year. Accordingly, respondent's burden of production is satisfied. See Hardin v. Commissioner, T.C. Memo. 2012-162.

Petitioner asserts the same reasonable cause defenses for the section 6654(a) addition to tax as for the section 6651(a)(1) and (2) additions to tax. Petitioner did not retire in 2006 or 2007. Petitioner's mental condition, an ASD, was already present at that time. Thus, he does not fall into the reasonable cause exception under section 6654(e)(3)(B). The record does not show that petitioner's failure to make estimated tax payments was due to casualty, disaster, or other unusual circumstances. Petitioner understood he had a duty to pay tax on his income in 2007 and did not argue that there were unusual circumstances in 2007 such that imposing a section 6654 addition to tax would be against equity and good conscience. Accordingly, we conclude that petitioner is liable for the section 6654 addition to tax for 2007.

IV. Financial Disability and Relief Under Section 6511(h)

Petitioner argues that he is entitled to relief from all additions to tax because his mental disorder qualifies him as a "financially disabled" taxpayer. Section 6511(h) provides for statutory tolling of the period of limitations on filing a claim

**[\*27]** for a refund or credit for overpayment of taxes when taxpayers are unable to manage their financial affairs. Financial disability under section 6511(h), however, has nothing to do with deadlines to file tax returns, pay tax, or pay estimated tax. Thus, petitioner's argument under section 6511(h) is irrelevant.

V.    Conclusion

We have considered all of the arguments made by petitioner, and to the extent not discussed above, conclude that those arguments not discussed herein are irrelevant, moot, or without merit. We have considered respondent's arguments only to the extent stated herein.

To reflect the foregoing and concessions by the parties,

Decision will be entered

under Rule 155.
